2022 IL App (1st) 200362

No. 1-20-0362

Opinion filed January 25, 2022

SECOND DIVISION

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| GRANVILLE TOWER CONDOMINIUM ASSOCIATION, an Illinois Not-For-Profit Corporation, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff and Counterdefendant-Appellee, | ) ) ) | Cook County |
| | ) | Nos. 17-M1-713845 & |
| v. | ) ) | 17-CH 14071 (cons.) |
| | ) | |
| HILDA ESCOBAR and ALL UNKNOWN OCCUPANTS, | ) ) ) | The Honorable James A. Wright, Judge Presiding. |
| Defendants | ) ) | |
| (Hilda Escobar, Defendant and Counterplaintiff-Appellant). | | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     The defendant and counterplaintiff, Hilda Escobar, appeals various rulings in a bench trial that resulted in a judgment in favor of the plaintiff and counterdefendant, Granville Tower Condominium Association, Inc., on the association's claims for possession of a condominium unit and for unpaid assessments and on Escobar's counterclaims for declaratory judgment, breach of

fiduciary duty, and breach of contract. We affirm the trial court's judgment.

¶ 2                                  I. BACKGROUND

¶ 3        On December 27, 2010, the association's board of directors passed a resolution adopting a special assessment in the amount of $4,150,000 to be levied upon the owners of all condominium units within the association according to their percentage of ownership. That resolution provided that 100% of each unit owner's proportionate share of the special assessment "shall be deemed to be fully and completely assessed." It then went on to provide:

> "Notwithstanding any financing taken by the Association or any payment arrangements which may be entered into, the Unit Owners of the Association will be deemed financially responsible for One Hundred Percent (100%) of said Special Assessment at the time it is levied. Should any Unit Owner of the Association fail to timely pay said Special Assessment, in accordance with any financing taken by the Association or payment arrangements which may be entered into, or default in any other responsibilities, the entire unpaid balance of said Special Assessment and all other unpaid assessments, fees, and/or costs, shall be deemed immediately due and owing."

¶ 4        At the time that the special assessment was levied, the owner of unit 20G was Ana Cruz. A ledger admitted into evidence at trial indicated that, following the levying of the special assessment, Cruz made payments of $31.51 per month toward the special assessment each month in 2011. In 2012, this amount increased to $64.22 per month, and Cruz made those payments. In 2013, the monthly payment due under the special assessment increased to $73.82. Cruz made a payment only for the month of January 2013 and thereafter ceased making any payments of the regular monthly assessment or special assessment due for unit 20G. On June 7, 2013, the association filed suit against Cruz for the unpaid assessments and ultimately obtained a money

judgment against her in the amount of $3867.47 and an order of possession for unit 20G.

¶ 5        Separately, a complaint for foreclosure was later filed against Cruz by her mortgage company. The association was named as a defendant in that suit. Hilda Escobar was the high bidder at the court-ordered foreclosure auction held on June 27, 2014. The sale was confirmed by the court on September 2, 2014. On July 15, 2014, Escobar made her first payment of regular and special assessments on unit 20G, in the amount of $834.96.

¶ 6        Thereafter, Escobar received a letter dated September 17, 2014, sent on behalf of the association by its property manager, Marla Stiefel. According to that letter, $36,808.55 in assessments and other charges were due to the association on the account for unit 20G at the time of closing. The letter stated that this sum comprised (1) $834.97 for the "[b]alance," (2) $23,529.14 for the special assessment, and (3) $12,444.44 as the "Amount Due from Prior Owner Account." Escobar disagreed that she owed the full amounts set forth in the letter.

¶ 7        By June 2015, Escobar was seeking to sell unit 20G, and for that purpose, she obtained a paid-assessment letter from the association. That paid-assessment letter stated that upon closing a total of $34,164.49 would be due to the association. It stated that this sum comprised (1) $787.61 for the balance due from the seller as of June 30, 2015, (2) $22,378.92 for the "Special Assessment thru 01/14/23," (3) $10,932.96 for the "[a]mount due from third party purchaser," and (4) $65.00 as a transfer fee to the property management company.

¶ 8        It is undisputed that Escobar made no further payments of assessments for unit 20G after June 15, 2015. On August 22, 2017, the association filed the suit against Escobar that is the subject of this appeal. In that suit, the association sought recovery of the unpaid assessments and

possession of her condominium unit. The suit was filed in forcible entry and detainer court.[1]

¶ 9    On October 20, 2017, Escobar filed a separate suit against the association in the chancery division of the circuit court. In the first count of her complaint in that case, Escobar sought a declaratory judgment that, pursuant to the applicable provisions of section 9(g) of the Condominium Property Act (765 ILCS 605/9(g) (West 2016)), Escobar (1) did not owe any monies left unpaid by Cruz, (2) the entirety of the 2010 special assessment was due and had become part of the association's lien under section 9(g)(1) (*id.* § 9(g)(1)) as of the time of the judgment in the foreclosure suit against Cruz, and (3) therefore, as Escobar had paid six months' worth of preforeclosure assessments as required by section 9(g)(3) (*id.* § 9(g)(3)), Escobar owed no further money to the association for the special assessment. The second count of the complaint alleged that the association had breached its fiduciary duty to Escobar by demanding that she pay amounts owed by Cruz and amounts that it alleged were due for the special assessment, which had been "wiped off the property" by the foreclosure sale and the payment of the preforeclosure assessments. Escobar alleged that the association's breach of fiduciary duty had prevented her from being able to sell unit 20G and to instead incur all the costs of ownership. Finally, the third count alleged that the same actions by the association resulted in a breach of the association's declaration and bylaws causing essentially the same damages. That count also alleged that the association had "intentionally interfered with and caused the breach of the contract by Escobar."

¶ 10    On May 16, 2018, the assignment judge of the law division granted Escobar's motion to consolidate the two cases. Although Escobar had argued that, because of the limited jurisdiction of the forcible entry and detainer court, the cases should be consolidated in the chancery division,

---

[1]Public Act 100-173 (eff. Jan. 1, 2018) amended article IX of the Code of Civil Procedure (735 ILCS 5/art. IX (West 2018)), generally changing references to forcible entry and detainer to eviction.

the assignment judge ordered that the consolidated case would pend in the forcible entry and detainer section.

¶ 11       The case ultimately proceeded to bench trial in November 2019. Prior to trial, the trial court granted an emergency motion filed by the association to quash a notice issued by the plaintiff pursuant to Illinois Supreme Court Rule 237 (eff. July 1, 2005). The trial court also denied a motion *in limine* filed by Escobar to bar the testimony of Brian Kelly, who is a senior supervisor for the new property management company retained by the association about five months prior to the trial.

¶ 12       Kelly testified at trial that, in his role as senior supervisor for the association's property management company, he had access to and was familiar with the books and records of the association. He identified the declarations for the condominium association and testified that they called for assessments to be collected from unit owners on a monthly basis. They also authorized late fees, interest, attorney fees, and court costs to be collected from unit owners who failed to make timely payments. He identified a ledger kept on behalf of the association showing assessment payments made by Escobar between July 2014 and November 2019, and he testified that it reflected that the association had not received any payments of assessments by Escobar since June 15, 2015. He identified the minutes of the meeting of the association's board of directors on December 27, 2010, and testified that the association had at that time adopted a special assessment in the amount of $4.15 million, assessed against each of the unit owners based upon their percentage of ownership. It also provided that the association would obtain a loan to make financing available to the owners. He testified that the association was seeking to collect special assessments from Escobar. Kelly testified that the association was seeking to collect from Escobar the unpaid regular and special assessments from July 15, 2014, to the present and that it was not seeking to collect any amounts from Escobar that came due while Cruz was the owner of the unit.

Kelly also testified that the association was seeking to collect late fees, interest, attorney fees incurred in the collection action, and the possession of unit 20G.

¶ 13       On cross-examination, Kelly identified the association's account ledger for unit 20G as of the time Escobar had purchased the unit. He testified that the balance owed on the unit as of the end of June 2014 was $12,677.53. He testified that this amount was owed by Cruz and was her debt. He testified that Escobar had made payments of $834.96 in July 2014, $884.95 in August 2014, $528.60 and $3171.60 in October 2014; $528.60 in November and December 2014; and then $586.69 each month from January through June 2015. He testified that, prior to Escobar's purchase, the association had obtained possession of the unit from Cruz and had rented it out at a rate of $1025 per month for 7 months. He identified the association's letter sent to Escobar dated September 17, 2014. He stated that the $834.97 balance shown on it would be for the regular and special assessment for that month. He testified that the amount shown on it as being due from the prior owner's account, which was $12,444.44, matches the balance shown on the account ledger for the unit as of August 18, 2014. It was also the final balance shown as being owed by Cruz on the ledger attached to the letter of September 17, 2014. He testified that the practice he had been trained on was that nothing ever comes off a unit's ledger until it is paid, even after a foreclosure. He testified that the last time Cruz had ever been current on her payments of the regular and special assessments was January 8, 2013. He identified the paid-assessment letter dated June 26, 2015, and explained that the purpose of such a letter would be to state the amounts due and owing at the time of the sale of a unit. He testified that the letter reflected that the amount of $10,932.96 was due from the third-party purchaser, but he testified that he did not know where that number had come from. He testified it could comprise various charges that he would have to investigate to reconstruct the calculation and determine precisely where the number had come from. Following

Kelly's testimony, the association rested.

¶ 14   The first witness called by Escobar was Wesley Smith, an officer of the association. He testified that the association's board of directors votes on some legal decisions and that those votes are recorded in the minutes of the executive session. He testified that, when a unit owner is delinquent on assessment payments, the association's procedure as set forth in its rules and regulations is that the property manager is directed to assign it to legal counsel for collection. He testified that the association's property manager attends board meetings and advises the board as to what actions should be taken. He testified that there are 154 units in the building and five board members. He testified that he is aware that the board members owe fiduciary duties to the members of the association and that this included treating all unit members fairly. He did not recall when he first learned of the dispute between Escobar and the association about the amount she owed.

¶ 15   Stiefel was called as a witness by Escobar and testified that she had been the association's property manager from March 2007 through November 2018. She testified that, as property manager for the association, nothing special was done to adjust the billing of assessments for units that were foreclosed upon and sold at auction, as opposed to sale through any other method. She testified that the procedure for rollover charges from a prior owner's billing after a sale occurred depended on the language of the Condominium Property Act. She confirmed the letter that she had sent to Escobar dated September 17, 2014, and she testified as to the numbers set forth on it. She testified that the inclusion of the $12,444.44 figure as the amount due from the previous owner meant that the letter was telling Escobar that she was required to pay that amount. She confirmed that the account ledger for Escobar showed that Escobar had made her first payment of assessments on July 15, 2014, in the amount of $834.96. She did not recall Escobar or anybody on her behalf objecting to the amount of assessments. She testified to the association's procedure when unit

owners became delinquent on the payment of their assessments and the referring of those cases to legal counsel for collections. She identified the paid-assessment letter sent to Escobar on June 26, 2015, and the amounts set forth in it. She testified that the $10,932.96 amount stated as being due from the third-party purchaser was based on the ledger at the time the paid-assessment letter was created, but she no longer had access to the files to know how the number was being calculated. She stated that those calculations would have been done either by herself or by the association's attorney. She stated that at one point, the statute had called for six months of past assessments to be included on a paid-assessment letter and at another time it called for everything on the previous ledger to be included. She did not know which method had been applicable in 2015 when this paid-assessment letter was created. She testified that she could not answer whether the $10,932.96 charge was the association trying to collect unpaid assessments assessed to the prior owner. She testified that she attended the board meetings of the association but was unable to recall any vote being taken on unit 20G.

¶ 16    Upon examination by the association's attorney, Stiefel testified that the association had filed a previous collection action against Cruz for unpaid assessments. She testified that in that suit the association was seeking unpaid amounts from February to June 2013. The association obtained a judgment against Cruz, which included possession of her unit. After taking possession of it, the association had to incur expenses to make that unit rentable, and those charges were included on the unit's account. She testified that the account ledger reflected several of those entries from February 1 and April 1, 2014, for items such as painting, floors, plumbing, and replacing the stove and refrigerator.

¶ 17    Escobar testified on direct examination that she purchased unit 20G on September 2, 2014, following a foreclosure auction that was held on June 27, 2014. Shortly after the action she made

an assessment payment on the unit. On September 17, 2014, she received a letter from the association stating that $36,808.55 was due at the time of closing. She had originally thought that she might live in the unit with her brother but decided to sell it instead. In June 2014, she had a buyer for the unit. She obtained the paid-assessment letter dated June 26, 2015, from the association, and she ultimately did not close with her prospective buyer because the association was seeking $34,164.49 in order to close on the unit. She testified that she had paid about $37,000 for the unit and the prospective purchaser was going to pay $60,000 for the unit. She testified that she would have experienced a large loss on the unit if she had gone through with the sale. She testified that, after she was unable to complete the sale, she stopped making assessment payments to the association because she ran out of money. She testified that she was not allowed to rent the unit due to rental restrictions imposed by the association. She testified that the fair market value of a rental would have been around $1200 in 2015 and $1400 by the time of trial.

¶ 18        On cross-examination, Escobar testified that the name of the prospective purchaser she had for the unit was Eric Cuevas. He was the prospective purchaser in both 2014 and 2015. She testified that she had a contract with him for the purchase of the unit, but she did not know if she had produced that contract in discovery. She did not recall assisting her attorney with producing documents in this case. Asked what she had done to try to fix the assessments that she disagreed with, she answered that she had contacted her lawyer. She had not met with the board of directors of the association. She testified that she lost Cuevas as a buyer because they could not figure out the issue of the disputed assessments. She did not recall when she lost the contract with Cuevas. She was not sure how she knew that she had lost the contract with Cuevas, whether she had received any documents from Cuevas that he was no longer intending to purchase the unit, or whether there was a closing schedule in 2014 for the sale of the unit. She could not recall whether

she had any documents supporting the fact that she had a buyer in 2014 or in 2015, or whether she had any documents to show why the closing did not occur in 2015. She testified that she was not sure if she listed the unit for sale again in 2015 after the sale to Cuevas fell through or if she tried to sell the unit in 2016. She testified that in 2017 she tried to sell it by continuing to keep in contact with Cuevas but that she could not sort out the assessment situation. She was not sure if she tried to list it through a realtor. She did not file a complaint in court against the association until October 20, 2017. She is herself a licensed real estate broker, but the court took judicial notice of a document from the Illinois Department of Financial and Professional Regulation reflecting that her license had been suspended in May 2019.

¶ 19    On redirect examination, Escobar testified that she was not aware of her real estate license being suspended. She testified that she did not enter into any written contract with Cuevas in 2014. She testified that she did enter into a written contract with Cuevas in June 2015. The association's attorney then objected to any further questioning on the issue of a written contract on the grounds that no written contract had been produced in discovery, which the trial court sustained.

¶ 20    The final witness was Escobar's brother, Petronilo Escobar. He testified that technically he was the realtor for the property, meaning he did not collect a commission because Escobar was his sister, but he prepared the offer, contract, and disclosures and provided them to buyer and seller. He testified that he did not list the property, but he worked with a number of buyers and investors to expose the property to them. Upon doing so, Cuevas showed interest in the property in 2014. No contract was entered into in 2014 between Escobar and Cuevas, because they could not get the assessments worked out and Escobar would have had to sell it for a loss. In June 2015, they did enter into a contract. The association's attorney objected to any line of questioning involving the contract, because no contract had been tendered in discovery and admitted into evidence. The trial

court sustained the objection, remarking that Escobar had testified on cross-examination that she did not know whether a contract had been entered into with Cuevas, despite the fact that she herself was a real estate broker. Thereafter, Petronilo Escobar was allowed to testify that in June 2015 he contacted Cuevas about the property to see if he was still interested and that he submitted a formal written offer with proof of funds and copy of the ordinance fund. He also testified that in June 2015 he submitted the contract and disclosure to Escobar's attorney and followed up to see what the progress had been with the association concerning the special assessments. He testified that the sale of the property never concluded and that he was not allowed to close because of the special assessments. He testified that he saw the paid-assessment letter from the association. He testified that the paid-assessment letter prevented the property from closing. He testified that he contacted the association and attempted to get the special assessment charges taken off the paid-assessment letter and, when he was unable to do that, he contacted Escobar's attorney. He testified that there was a contract with Cuevas involving this unit toward the end of June 2015, that he had seen that contract, that the signatures of Cuevas and Escobar were on the contract, and that the purchase price of the contract was $60,000 cash. He testified that Cuevas canceled the contract in July 2015 and was unwilling to purchase the unit after that. He testified that he had seen the letter to Escobar dated September 17, 2014, indicating that the association was stating that Escobar owed $12,444.44. He testified that he had spoken with Stiefel about having those charges removed and that the association had refused to do so.

¶ 21        Escobar thereafter rested. The parties then submitted written closing arguments followed by an oral argument. On the association's claim for unpaid assessments and possession of the unit, the trial court found in favor of the association. It found the evidence undisputed that the association was seeking only to recover assessments that had become due after Escobar became

the owner of unit 20G and that Escobar had paid no assessments since June 2015. It found that her inability to pay was not a defense. It rejected the argument that section 9(g) of the Condominium Property Act extinguished liability for special assessments. See 765 ILCS 605/9(g) (West 2016). It found Escobar to be an uncredible witness, as she was evasive in her answers and could recall nothing about the purported sale of the property despite being a real estate agent. The trial court also found Petronilo Escobar to have been a biased and untruthful witness. It therefore entered judgment in favor of the association and against Escobar, awarding possession of the unit to the association and a money judgment of $110,646.15 in assessments, court costs, and attorney fees.

¶ 22    The court also ruled in favor of the association on Escobar's counterclaims for declaratory judgment, breach of fiduciary duty, and breach of contract. The trial court found no evidence that Escobar had made any real efforts to resolve the differences that existed with regard to the amounts stated as being owed on the paid-assessment letter, such that it would prevent her from selling the unit. It found no evidence that she made any other attempts to sell the unit. It denied declaratory relief on the basis that the association had only sought assessments since Escobar became the owner of the unit and that section 9(g) of the Condominium Property Act does not exclude special assessments. It found no breach of fiduciary duty because the evidence had shown that the board members relied on the advice of the association's attorneys about what amounts were due and owing when they sent the paid-assessment letter. It found no breach of contract or tortious interference with contract based on Escobar's failure to introduce any credible evidence of a contract with a buyer or knowledge thereof by members of the association's board.

¶ 23                                II. ANALYSIS

¶ 24                    A. Escobar's Liability for Special Assessment

¶ 25    Although her argument is somewhat unfocused, Escobar's principal argument on appeal is

that she never incurred any legal obligation to make payments toward the special assessment that the association had levied in 2010. Because of this, she argues, the trial court erred by including an amount for unpaid special assessments in its judgment on the association's claim, by denying the declaratory judgment that she sought, and by concluding that the association's board of directors had not breached its fiduciary duty or its contractual obligations to her by demanding payments for the special assessment that she did not owe.

¶ 26   Preliminarily, we reject Escobar's argument that the 2010 special assessment was never properly adopted because the association did not obtain a vote of two-thirds of the association's members. We agree with the association that this issue was never raised in the trial court and therefore may not be raised for the first time on appeal. *Romito v. City of Chicago*, 2019 IL App (1st) 181152, ¶ 33.

¶ 27   Generally, the standard of review following a bench trial is whether the trial court's order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence or when an opposite conclusion is apparent. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23. Under this standard of review, the appellate court gives deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses and achieves a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). The appellate court therefore does not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to evidence, or the inferences to be drawn. *Id.* at 499. Accordingly, the trial court's judgment will be affirmed provided the record contains any evidence supporting it. *In re Estate of Wilson*, 238 Ill.

2d 519, 570 (2010). However, to the extent that issues in a bench trial involve the interpretation of statutes or the legal effect of documents, such rulings are conclusions of law that the appellate court reviews *de novo*. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 28    Escobar's argument concerning her liability for special assessments involves application of section 9 of the Condominium Property Act (765 ILCS 605/9 (West 2016)) and the legal effect of the resolution adopted by the association's board of directors on December 27, 2010, levying the special assessment. When a controversy arises regarding the rights of a condominium unit owner with respect to the unit owners' association, the court examines any relevant provisions in the Condominium Property Act and the governing documents of the condominium property and construes them as a whole. *V&T Investment Corp. v. West Columbia Place Condominium Ass'n*, 2018 IL App (1st) 170436, ¶ 22. The primary objective of statutory construction is to give effect to the legislature's intent, presuming that it did not intend to create absurd, inconvenient, or unjust results. *In re Marriage of Petersen*, 2011 IL 110984, ¶ 15. The most reliable indicator of legislative intent is the language used, given its plain and ordinary meaning. *Id.* Questions of statutory interpretation are matters of law reviewed *de novo*. *Id.* ¶ 9. These same principles apply to our construction of the resolution passed by the association's board of directors.

¶ 29    Section 9 of the Condominium Property Act imposes a duty on the owner of a condominium unit to pay his or her proportionate share of the property's common expenses (which includes special assessments) and grants a lien in favor of the condominium association against any unit owner who fails or refuses to make such a payment when due. 765 ILCS 605/9(a), (g)(1) (West 2016). Specifically, section 9(g)(1) states in pertinent part, "If any unit owner shall fail or refuse to make any payment of the common expenses *** when due, the amount thereof *** shall constitute a lien on the interest of the unit owner in the property ***." *Id.* § 9(g)(1).

¶ 30        Sections 9(g)(3) and 9(g)(4) address the duties that a person purchasing a condominium unit through a judicial foreclosure sale has to pay common expenses that were previously due and that are due in the future, and they confer certain benefits upon purchasers complying with these provisions. With regard to common expenses previously due, section 9(g)(4) provides that such a purchaser (other than a mortgagee) shall have a duty to pay the proportionate share, if any, "of the common expenses for the unit which would have become due in the absence of any assessment acceleration during the 6 months immediately preceding institution of an action to enforce the collection of assessments, and which remain unpaid by the owner during whose possession the assessments accrued." *Id.* § 9(g)(4). It further provides that, "[i]f the outstanding assessments are paid at any time during any action to enforce the collection of assessments, the purchaser shall have no obligation to pay any assessments which accrued before he or she acquired title." *Id.*

¶ 31        With respect to the payment of future common expenses, section 9(g)(3) provides that a purchaser "shall have the duty to pay the unit's proportionate share of the common expenses for the unit assessed from and after the first day of the month after the date of the judicial foreclosure sale." *Id.* § 9(g)(3). It goes on to provide that such payment "confirms the extinguishment of any lien" created under section 9(g)(1) by the prior unit owner's failure or refusal to pay the common expenses, where the judicial foreclosure sale has been confirmed by order of court. *Id.*

¶ 32        Relying on the provisions of section 9 set forth above and the language of resolution adopting the special assessment on December 27, 2010, Escobar argues that the entire amount of the special assessment owed for unit 20G became due when Cruz defaulted on her payment obligations, that it was therefore included within the association's lien under section 9(g)(1) at the time she purchased the unit at the foreclosure sale, and that as part of the lien it was "extinguished" under section 9(g)(3) when she paid the unit's proportionate share of common expenses from and after

the first day of the month following the foreclosure sale. To support of the first part of this argument, Escobar cites the resolution's language that, as of the time of its adoption in 2010, each unit owner's share "shall be deemed to be fully and completely assessed" and that the unit owners were "deemed financially responsible for One Hundred Percent (100%) of said Special Assessment at the time it is levied." Most significant to her argument is the following sentence of the resolution:

> "Should any Unit Owner of the Association fail to timely pay said Special Assessment, in accordance with any financing taken by the Association or payment arrangements which may be entered into, or default in any other responsibilities, the entire unpaid balance of said Special Assessment and all other unpaid assessments, fees, and/or costs, shall be deemed immediately due and owing."

She contends that, by operation of the preceding sentence, Cruz's complete failure to make payments owed on the special assessment by 2013 means that "the entire unpaid balance of said Special Assessment *** shall be deemed immediately due and owing."

¶ 33    We reject Escobar's argument that the entire amount of the special assessment automatically became due and included in the section 9(g)(1) lien at the time when Cruz defaulted on her obligations to make payments on the special assessment. We do not interpret this resolution's use of the phrase "shall be deemed immediately due and owing" to indicate something that happens automatically or by operation of law. Generally, the use of the word "shall" in a statute (or, here, in a resolution passed by the board of directors of a condominium association) indicates something that is mandatory, but "shall" may be interpreted as permissive depending on the context of the provision and the intent of the drafters. *People v. Woodard*, 175 Ill. 2d 435, 445 (1997). "The meaning of 'shall' is 'grounded on the "nature, objects and the consequences which would result

from construing it one way or another." ' " *Emerald Casino, Inc. v. Illinois Gaming Board*, 346 Ill. App. 3d 18, 27 (2003) (quoting *Andrews v. Foxworthy*, 71 Ill. 2d 13, 21 (1978), quoting *Carrigan v. Illinois Liquor Control Comm'n*, 19 Ill. 2d 230, 233 (1960)). "When determining the meaning of 'shall,' courts often base their decisions on whether someone's private rights or interests are at stake." *Id.* at 31.

¶ 34    Here, the context of the phrase "shall be deemed immediately due and owing" indicates an intent by the board of directors to grant the unit owners' association permission and authority to treat a unit owner's failure to make a timely payment of the special assessment as causing the entire unpaid balance to become due. The purpose of this provision is plainly to give unit owners an incentive to make timely payments of the special assessment and to give the association enforcement leverage against unit owners who are especially recalcitrant in their refusal to pay the special assessment. The purpose of this provision is not to impose a draconian consequence on unit owners who miss a payment, by making them immediately responsible to pay the entire amount owed. Likewise, its purpose is not to provide the unit owners' association or its lender with a financial windfall whenever a unit owner misses a payment. It would be absurd and unjust to conclude that the board of directors intended that, any time a unit owner failed to make a timely payment of an installment of the special assessment, the unit owners' association had a mandatory obligation to treat that unit owner's entire balance as being immediately due and owing and to seek to collect that entire balance. See 765 ILCS 605/18(o) (West 2016) ("association shall have no authority to forbear the payment of assessments by any unit owner").

¶ 35    Furthermore, this interpretation conforms with the enforcement powers of the association set forth in its declarations and bylaws and its rules and regulations. Section 8 of article XV of the association's declarations and bylaws addresses the association's rights to collect unpaid

assessments from delinquent unit owners and to impose liens in the amount of such unpaid assessments. Among the association's rights set forth in that section is "the right, by giving such defaulting Unit Owner five days' written notice of the election of the Board so to do, to accelerate the maturity of the unpaid installments of such expenses accruing with respect to the balance of the assessment year." The collection policy set forth in the association's rules and regulations contains a nearly identical provision. These provisions give the association's board "the right" to make "the election" to accelerate the maturity of unpaid installments of assessments. They do not treat the acceleration of unpaid installments as something that is automatic or mandatory.

¶ 36 Finally, this interpretation conforms with the way that the association actually acted in response to the failure by Cruz to make timely payments of the special assessment beginning in January 2013. When the association filed suit against Cruz for the unpaid assessments in June 2013, it sought only the amount of unpaid special assessments from February to June 2013. It obtained a judgment in the amount of $3867.47, which is far less than the entire proportionate share of the special assessment that would have then been due for unit 20G. There was no evidence that the association or its board ever treated the entire amount of the special assessment as being due and owing based on the default by Cruz.

¶ 37 For these reasons, we conclude that the entire unpaid balance of the 2010 special assessment did not become due and owing prior to Escobar's purchase of unit 20G through the judicial foreclosure sale in 2014. Because only those common expenses that are "due" and unpaid constitute a lien on the unit owner's interest in the property under section 9(g)(1) of the Condominium Property Act (*id.* § 9(g)(1)), the entire unpaid balance of the 2010 special assessment was not included within the lien at the time of Escobar's purchase. As it was not included within the lien created under section 9(g)(1), it was not extinguished by Escobar's

payment of the unit's proportionate share of the common expenses assessed from and after the date of the judicial foreclosure sale. See *id.* § 9(g)(3). Escobar became and remained liable for the monthly installments of the special assessment that became due after she purchased unit 20G. *Id.* It was therefore not error for the trial court to include these amounts within the association's judgment against her for unpaid assessments, to deny the declaratory judgment that Escobar was not liable for special assessments, or to conclude that the association had not breached its fiduciary duty or its contractual obligations by taking the position that Escobar was responsible for postpurchase payments of the special assessment.

¶ 38                    B. Findings on Breach of Fiduciary Duty and Breach of Contract Counts

¶ 39        Escobar also argues that it was against the manifest weight of the evidence for the trial court to conclude that the association had not breached its fiduciary duties or contractual obligations to her. Apart from its demanding of the special assessment, which we have addressed above, she argues that the association breached its fiduciary duties and its obligations under the declarations and bylaws by giving too much authority to its property manager and failing to properly monitor the property manager's activities, by failing to remove the charges for which Cruz was responsible from the account for unit 20G after Escobar purchased it and seeking money from Escobar that she did not owe, and by failing to discuss Escobar or her unit at a board meeting and to authorize litigation against her until 2019. The trial court determined that the association had not breached any duties owed to Escobar because its board of directors had relied upon the advice of its professional property manager and legal counsel in determining what amounts were owed by Escobar after her purchase of unit 20G in the foreclosure sale. It also determined that Escobar had not sustained damages proximately caused by any breach of duties owed by the association, because the only amounts the association sought from her in its lawsuit were for assessments that

accrued after she became the owner of the unit, the evidence showed no effort by her to dispute the charges on the paid-assessment letter, and the evidence showed only minimal effort by her to sell the unit. It also found that Escobar was not a credible witness.

¶ 40       These decisions involving the credibility of the witnesses and the ultimate conclusions to be drawn from the evidence were the prerogative of the trial court. *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529, ¶ 118. Our review of the testimony and evidence at trial indicates that the trial court's determinations were reasonable and fully supported by the evidence. The trial court's judgment in favor of the association on Escobar's counts for breach of fiduciary duty and breach of contract is not against the manifest weight of the evidence.

¶ 41                    C. Jurisdiction of Forcible Entry and Detainer Court

¶ 42       Escobar next argues that numerous errors by the trial court caused the trial to be fundamentally unfair and therefore a new trial should be ordered. The first such error, according to Escobar, was the assignment of the consolidated cases to the forcible entry and detainer section of the municipal department instead of to the chancery division. Escobar argues that, as a court of limited jurisdiction, the forcible entry and detainer court lacked jurisdiction to fully adjudicate her counterclaims for declaratory judgment, breach of fiduciary duty, and breach of contract.

¶ 43       An action against a condominium unit owner who fails or refuses to pay assessments when due may be brought in forcible entry and detainer court. See 735 ILCS 5/9-102(a)(7) (West 2016); 765 ILCS 605/9.2(a) (West 2016). However, forcible entry and detainer actions (*i.e.*, eviction actions) are limited, summary proceedings with the purpose of providing a speedy remedy to restore possession of real property to those entitled to it. *Wells Fargo Bank, N.A. v. Watson*, 2012 IL App (3d) 110930, ¶ 14. Thus, by statute, "matters not germane to the distinctive purpose" of a forcible entry and detainer proceeding may not be introduced by joinder, counterclaim, or

otherwise. 735 ILCS 5/9-106 (West 2016). Historically, this "distinctive purpose" was to gain possession of property unlawfully withheld, but it has been expanded to encompass certain claims for money judgments as authorized by statute. *Spanish Court Two Condominium Ass'n v. Carlson*, 2014 IL 115342, ¶¶ 15-16. In a claim for possession of a condominium unit arising from unpaid assessments, the question of whether the unit owner in fact owes the assessments is germane to the proceedings. *Id.* ¶ 18.

¶ 44       We reject Escobar's argument that there was error in the assignment of this consolidated action to the forcible entry and detainer section or that the jurisdiction of that court was such as to deprive her of a fair trial on her counterclaims. It is well established that the fact that the circuit court of Cook County has established administrative divisions to hear certain types of cases does not affect its jurisdiction to hear all justiciable matters, nor does it affect the power of any of the circuit court's judges to hear and dispose of any matter properly pending in the circuit court. *Fulton-Carroll Center, Inc. v. Industrial Council of Northwest Chicago, Inc.*, 256 Ill. App. 3d 821, 823 (1993). Consistent with this principle, we see no indication from our review of the record that Escobar was provided with anything other than a full and fair trial on all of her counterclaims that were assigned to the forcible entry and detainer court. As referenced above, the concern in forcible entry and detainer cases is with providing a speedy remedy to restore possession. Here, however, there is no indication that concern with providing a speedy remedy deprived Escobar of her right to fully investigate her counterclaims or to receive a full trial on the merits. Rather, the record indicates that the trial court provided the parties with time to conduct written and oral discovery, entertained multiple motions by Escobar to compel discovery, and considered motions for summary judgment filed by both parties. It ultimately conducted a bench trial that spanned five days and produced a trial transcript exceeding 500 pages, which reflects that the trial court fully

considered all testimony and evidence properly presented by Escobar on her counterclaims.

¶ 45                    D. Quashing Notice to Produce Witnesses

¶ 46    Escobar next argues that the trial court erred in granting the association's emergency motion to quash the Rule 237 notice that Escobar had issued to the association to have all current members of its board of directors appear at trial. See Ill. S. Ct. R. 237 (eff. July 1, 2005). In that emergency motion, the association asserted that Escobar's Rule 237 notice was issued in an untimely manner and that requiring all of its current board members to come to trial to testify was unnecessary and unduly burdensome.

¶ 47    The certificate of service indicates that Escobar served the Rule 237 notice on November 6, 2019, for the trial set to begin on November 13, 2019. The association filed its emergency motion on Friday, November 8, and served it by e-mail on Escobar's attorney that day. The emergency motion was scheduled for presentment on Tuesday, November 12, at 2 p.m. Monday, November 11, was a court holiday. The affidavit of the association's attorney attached to the emergency motion stated that she had e-mailed Escobar's attorney about the Rule 237 notice at 9:32 a.m. on Thursday, November 7, and had not received a response. It also stated that on Friday, November 8, she had placed four calls to the phone number identified in the notice but was unable to leave a voicemail and had not received a return call. The order granting the emergency motion reflects that Escobar's counsel was not present.

¶ 48    Later on November 12, Escobar's attorney filed an emergency motion to vacate the order quashing the Rule 237 notice, on the basis that the association had failed to give him reasonable and timely notice of its own emergency motion. When Escobar's motion was presented the following day, the trial court denied it. The trial court concluded that the association's attorney had made "her best effort to get in contact with" Escobar's attorney several times but was unable

to leave a voicemail.

¶ 49     The quashing of a Rule 237 notice is a matter vested in the trial court's discretion. *Cohn v. Board of Education of Waukegan Township High School District No. 119*, 118 Ill. App. 2d 453, 456 (1970). Upon the above facts, we do not find that the trial court abused its discretion by granting the association's emergency motion to quash the notice or in thereafter refusing to vacate its order. Escobar's brief does not adequately rebut the association's argument that it was unnecessary and unduly burdensome to have all of its board members, who are volunteers, appear at the trial upon one week's notice. Although she sets forth topics about which she wanted to question all of the board members, she fails to identify any specific information in the possession of any particular individual from whom she required testimony. As the association did produce one of its board members for questioning on these topics by Escobar, we find that Escobar has failed to show prejudice from her inability to question all of the association's board members at trial.

¶ 50                    E. Allowing Testimony by Kelly

¶ 51     Escobar next argues that the trial court erred by denying her motion *in limine* to bar the association from calling Brian Kelly as a witness. The association does not dispute that it was not until the Friday afternoon prior to the Wednesday trial that it supplemented its witness disclosures to name Kelly as its sole witness. Escobar argues that the association's disclosure of Kelly was untimely under Illinois Supreme Court Rule 218(c) (eff. July 1, 2014), which requires that witnesses be disclosed at such time to ensure that all discovery is completed no later than 60 days before trial. Escobar also argues that the association's disclosure of Kelly failed to identify the subjects on which he would testify, as required by Illinois Supreme Court Rule 213(f)(1) (eff. Jan. 1, 2018).

¶ 52        The admission of evidence pursuant to Rule 213(f) lies within the trial court's discretion and will not be reversed absent an abuse of discretion. *Kovera v. Envirite of Illinois, Inc.*, 2015 IL App (1st) 133049, ¶ 59. Rule 213(f)(1) requires that, upon written interrogatory, a party must furnish the identities and addresses of lay witnesses who will testify at trial and identify the subjects on which the witness will testify. Ill. S. Ct. R. 213(f)(1) (eff. Jan. 1, 2018). Rule 213(i) imposes upon a party a duty to "seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018). The disclosure requirements of Rule 213 are mandatory, and parties must strictly comply with them. *Kovera*, 2015 IL App (1st) 133049, ¶ 59. However, the failure to comply with Rule 213 does not automatically require the exclusion of a noncomplying party's witnesses or testimony. *Id.* In determining whether the trial court erred in allowing a previously undisclosed witness to testify, courts consider (1) the surprise to the adverse party, (2) the prejudicial effect of the testimony, (3) the nature of the testimony, (4) the diligence of the adverse party, (5) the timely objection to the testimony, and (6) the good faith of the party calling the witness. *Pancoe v. Singh*, 376 Ill. App. 3d 900, 913 (2007).

¶ 53        In this case, neither the interrogatories propounded by Escobar nor the association's initial or supplemental witness disclosures are included in the record on appeal. Without these, we are unable to determine whether the association violated the requirements of Rule 213(f)(1). However, even if we considered the above factors, we cannot say that the trial court abused its discretion by allowing Kelly's testimony under the specific circumstances of this case. Although the association's disclosures are not included in the record, Escobar states that the association had disclosed Stiefel, an employee of the property management company used by the association prior to July 1, 2019, to testify as a lay witness to "amounts owed on the ledger, the special assessment,

and any repairs made to Unit 20G, any notices, the accounting practices of First Service Residential and consistent with any discovery deposition, if taken." As stated, Kelly was a senior supervisor employed by the association's new property management company, which had taken over on July 1, 2019. The transcript of Stiefel's deposition, taken on July 16, 2019, is included in the record and reflects her testimony that the association had changed management companies by that time. Thus, we cannot say that Escobar should have been entirely surprised that the association would have substituted an employee of its current property management company instead of Stiefel to testify on these subjects. Also, the substitution of Kelly as a witness instead of Stiefel does not appear to have been in bad faith.

¶ 54    Most significantly, though, the nature of Kelly's testimony in the association's case-in-chief was only to establish a foundation for the records of the association and its property management company to be admitted into evidence, demonstrating that assessments had been levied by the association and not paid by Escobar. This was essentially no different than what the association had disclosed Stiefel's testimony to be, and therefore the prejudicial effect of having Kelly give this testimony instead of Stiefel was minimal.

¶ 55    That said, we admonish the association's attorney about the importance of seasonally supplementing or amending prior discovery answers at the time when new or additional information becomes available. It appears that the association's attorneys knew at least four months prior to the trial that the association had changed property management companies and that Stiefel might not be the appropriate Rule 213(f)(1) witness to testify on the association's behalf. There is firsthand knowledge that Stiefel had as an agent of the association's property management company during the time period involved in this case that Kelly did not have, and Escobar's attorney should have been given time to consider and prepare for this. We see no excuse

for waiting until two court days prior to the trial to disclose to Escobar that Kelly would testify as a witness in this case.

¶ 56                    F. Forbidding Galic from Sitting at Counsel's Table

¶ 57        Escobar next argues that the trial court erred by forbidding attorney Andjelko Galic from sitting at the table with Escobar's attorney in order to assist him with the handling of exhibits and to confer with him. Galic is apparently not affiliated with the same law firm as Escobar's attorney, had no appearance on file, and was not representing any party in the case. On the first day of trial, the court asked Galic to identify himself and questioned whether he would be participating in the trial. Galic said he was not participating, and Escobar's attorney stated that Galic would be giving him advice but would not be examining witnesses. The trial court responded that was fine and stated that Galic would be permitted to stay.

¶ 58        On the fourth day of the trial, while the court and attorneys were discussing the use of an exhibit during the direct examination of Petronilo Escobar, the record indicates that the trial court interrupted the proceedings and said to Mr. Galic, "Sir, are you trying this case?" Galic responded that he was not, and the trial court said to him, "Have a seat in the bench." Escobar's attorney then said, "Your Honor, I would like Mr. Andjelko [*sic*] to be here to—" at which point the trial court again said, "Have a seat on the bench, sir." Shortly thereafter, the court broke for lunch. When it returned to session, Escobar's attorney informed the court that Galic had entered an additional appearance on behalf of Escobar. The trial court responded that it would not allow a new attorney to join the case during the questioning of the last witness of the trial. The trial court stated that Galic could slip notes to Escobar's attorney if he wanted to tell him something but that he must sit on the front row of the gallery and not at the table with Escobar's counsel.

¶ 59        Although it is not expressly reflected in the record, we can surmise from the trial court's

interruption to address Galic that some disruption was created by Galic's attempts to assist or advise Escobar's attorney in the handling of the case. Thus, the ordering of Galic to sit in the front row of the gallery rather than at counsel's table with Escobar appears to be a matter well within the trial court's inherent authority to control the courtroom and avoid disruption. See *In re General Order of March 15, 1993*, 258 Ill. App. 3d 13, 17 (1994). We find no error by the trial court.

¶ 60                    G. Barring Testimony by Petronilo Escobar About Contract

¶ 61        Finally, Escobar argues in one paragraph that the trial court erred in barring her brother and realtor, Petronilo Escobar, from testifying about the sales contract that purportedly existed between Escobar and a potential buyer of the unit. We need not belabor this issue. The primary reason the trial court barred testimony about the contract was because Escobar, who was herself a realtor, had failed to disclose the existence of a written contract with Cuevas during discovery. It was not until cross-examination of Escobar by the association's attorney that Escobar's counsel disclosed for the first time that such a contract did exist but was not in his possession that day. Thereafter, the trial court sustained several objections by the association's attorney to any line of questioning involving the contract, including to testimony by Petronilo Escobar on the topic. The trial court's barring of Petronilo Escobar from testifying concerning issues involving the contract was an appropriate exercise of discretion based upon Escobar's failure to produce the contract in discovery. Ill. S. Ct. R. 219(c)(iv) (eff. July 1, 2002); *People ex rel. Hartigan v. Organization Services Corp.*, 147 Ill. App. 3d 826, 832 (1986).

¶ 62                                III. CONCLUSION

¶ 63        For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 64        Affirmed.

**No. 1-20-0362**

| | |
|---|---|
| **Cite as:** | *Granville Tower Condominium Ass'n v. Escobar*, 2022 IL App (1st) 200362 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 17-M1-713845, 17-CH-14071; the Hon. James A. Wright, Judge, presiding. |
| **Attorneys for Appellant:** | John Cloutier, Cloutier Law Group, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Gabriella R. Comstock, of Keough & Moody, P.C., of Naperville, for appellee. |