**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220015-U

Order filed February 2, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| 1095 SOUTH SCHUYLER PARTNERSHIP, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellee, | ) | Kankakee County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0015 |
| | ) | Circuit No. 19-LM 928 |
| | ) | |
| GOODBERLET HOME SERVICES, INC., | ) | |
| and JOHN M. KILROY | ) | Honorable |
| | ) | J. Imani Drew, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Holdridge and Justice Brennan concur in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's award of damages for certain tuckpointing performed on plaintiff's commercial building was not against the manifest weight of the evidence. However, $150 of the damages was not supported by the evidence, so we reduce the judgment by that amount. Affirmed as modified.

¶ 2    After a bench trial, the trial court entered judgment in favor of plaintiff, 1095 South Schuyler Partnership, on its breach-of-lease claim against defendants, Goodberlet Home Services, Inc., and John M. Kilroy. Plaintiff's complaint alleged defendants breached the lease, in part, by

failing to pay rent and late fees, vacating the lease prior to its expiration, and neglecting its duty to maintain the property in good condition and repair. The court awarded to plaintiff damages totaling $34,806.50, which included, among other items, $15,090 for the cost of tuckpointing the inside and outside of the exterior walls of the building. A portion of that amount consisted of $150 plaintiff expended to repair the southeast corner of the property.

¶ 3     Defendants' sole contention on appeal is that the damages award of $15,090 for tuckpointing was against the manifest weight of the evidence. Specifically, they argue plaintiff failed to prove the wall damage did not preexist their possession of the property or was caused by their breach, not normal wear and tear.

¶ 4     We agree in part with defendants' contention. The evidence did not support a finding that defendants' breach caused the need to repair the southeast corner of the building. Accordingly, we reduce the judgment by $150 and otherwise affirm.

¶ 5                              I. BACKGROUND

¶ 6                            A. The Partnership

¶ 7     Plaintiff, a partnership consisting of three sibling partners, Richard Girard, Janet Giroux, and Francis Girard, owned property, which was improved by a commercial showroom and warehouse, located at 1095 South Schuyler Avenue in Kankakee. For 30 or 35 years, the siblings' family business, Girard Electric, operated at the property. On September 17, 2017, the siblings sold the business, but plaintiff remained the property's owner.

¶ 8            B. The Lease and Defendants' Abandonment of the Property

2

¶ 9    On September 18, 2017, plaintiff leased the property to Goodberlet for a two-year term expiring on September 17, 2019. Kilroy and Melanie Boehm Alejandre[1] individually guaranteed the lease. The lease required Goodberlet to pay $5500 in monthly rent, imposed a 5% late fee if rent was more than five days late, and expressly prohibited Goodberlet from vacating or abandoning the property at any time during the lease term. The lease also gave plaintiff the right to enter the premises to inspect and make repairs and required Goodberlet to provide plaintiff with a key to the premises. Additionally, paragraph 6 of the lease stated as follows:

> "MAINTENANCE AND REPAIR: [Goodberlet] shall, at [its] own cost and without any expense to [plaintiff], keep and maintain all portions of the property in a clean, neat, and orderly condition at all time [*sic*] and otherwise in good condition and repair including, but not limited to, all necessary repairs, replacements, or alterations to the walls, ceiling, floors, and interior and exterior walls of the Property, and the heating, cooling, electrical, plumbing, water, and other utility systems serving the Property. [Goodberlet] shall be responsible for maintenance of any and all parking lots on the property and furthermore [Goodberlet] shall be responsible for maintenance of any and all signage located on the property. [Plaintiff] shall maintain and make all necessary repairs, replacements[,] or alterations to the building exterior and lighting for the Property parking lot."

¶ 10    About a year into the term, Goodberlet vacated the property. It continued to pay rent until July 2019—though it paid more than five days late in February, May, June, and July—and paid no rent in August and September 2019.

---

[1] Melanie is referred to as "Melanie Boehm Alejandre" in the lease but as "Melanie Boehm" in other parts of the record. In any event, she later petitioned for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 1101 *et seq.* (2019)) and is not a party to this action.

¶ 11    At the end of the lease, Richard Girard entered the property and found it in disarray. He also observed water damage and loose bricks and mortar on the exterior walls of the building. The siblings and their personal associates expended more than 500 hours of their own time, and plaintiff hired several third parties to restore the property to its prelease condition. Relevant here, the partnership paid $15,090 to a masonry company to repair the exterior walls of the building and $2168 to a roofing company to repair multiple roof leaks.

¶ 12                                C. The Complaint

¶ 13    In December 2019, plaintiff sued defendants and claimed damages for unpaid rent and late fees, based on the untimely or nonpayments described above, and the costs of restoring the building to its prelease condition. As to its claim for the restoration cost, plaintiff alleged in part that Goodberlet breached the lease when it abandoned the property before the end of the lease and changed the locks without providing plaintiff a key. As a result of Goodberlet's abandonment, plaintiff continued, "an unreported roof leak caused substantial damage not only to the roof, but the brickwork, ceiling, and floor of the building on the [p]roperty."

¶ 14                                D. Bench Trial

¶ 15    The matter proceeded to a bench trial on June 22, 2021. The report of proceedings contains the transcript of only one witness, Richard's, testimony.[2]

¶ 16    Richard testified the building was constructed in 1964 and 1965. A portion of it had parapet walls, meaning the exterior walls extended above the roof. In the mid-eighties, he and his siblings

_____

[2] The trial court's docket is not included in the record. But it is available online, and we take judicial notice of it. See *Asher Farm Limited Partnership v. Wolsfeld*, 2022 IL App (2d) 220072, ¶ 31 (reviewing court may *sua sponte* take judicial notice of court records). The docket entry for June 22, 2021, states that a "witness [was] sworn" and "evidence [was] heard" during plaintiff's case and that defendant presented evidence. It does not specify whether plaintiff presented any other testimony or what evidence defendant presented. However, in its response to defendants' motion to reconsider (defendants' motion is discussed below), plaintiff noted that defendants presented the testimony of Frank Brisco.

4

purchased the property and, for about 35 years, operated their family business, Girard Electric, on it. On September 17, 2017, Goodberlet purchased Girard Electric, but plaintiff retained ownership of the property and leased it to Goodberlet for a two-year term commencing on September 18, 2017, and terminating on September 17, 2019.

¶ 17    Before plaintiff leased the property to defendants, Richard worked at the property six days a week. He routinely examined the property, monitored the need for maintenance, and did so again immediately before Goodberlet took possession. Richard never observed any indications that the roof was leaking or the walls were damaged or needed tuckpointing. After plaintiff purchased the property, it never once had the building tuckpointed, and Richard did not know how often such a building should be tuckpointed.

¶ 18    After Goodberlet took possession, it began operating the electrical business on the property. Richard did not know how long Goodberlet operated there, but, about 10 months into the lease, in August 2018, Goodberlet placed a sign on the building that stated it had moved to a new location. Goodberlet also posted on the property an advertisement for a "moving sale." At some point in 2018, Richard observed Alejandre's father removing from the building shelves that, under the terms of the contract for sale of the business, belonged to plaintiff. The parties stipulated that Goodberlet paid rent more than five days late in February, May, June, and July 2019 and paid no rent in August and September 2019.

¶ 19    During the lease term, plaintiff never attempted to enter the property. At some point, Goodberlet changed the locks and, despite its obligation otherwise, never provided plaintiff with a key. After the lease expired, on September 19 or 20, 2019, Giroux called Goodberlet and obtained a key for the property, and Richard entered the building and found "an absolute mess." According to Richard, it looked like it had been "ransacked." He discovered water-soaked furniture and

5

ceiling tiles. He found water damage on the ceiling of an office and the walls, including loose mortar, bricks, and blocks, which, based on his observations and experience, was "obvious[ly]" caused by a roof leak. Richard testified there were multiple leaks at the joint of the roof and the parapet walls, mostly on the north side and on parts of the west and east sides of the building. (The south side of the building did not have a parapet wall.) Near the leaks on the north and west sides, he observed damage to the exterior wall, both inside and outside of the building. According to Richard, the water had run down the walls and, in the winter, "it froze and popped the brick and the block loose." Richard agreed masonry work would not "just deteriorate right away because of a leak" but did not know how long it would take.

¶ 20        Richard's wife took several photographs of the property's condition, which were admitted into evidence and we have reviewed. The photographs confirm that Richard accurately described the property as "an absolute mess." The photographs also showed water damage to an office ceiling, a bookcase, and the exterior wall, both inside and outside the building. Plaintiff did not submit any photographs of the property's prelease condition.

¶ 21        Plaintiff paid $2168 to a roofing company, which repaired the flashing at the joint of the roof of the parapet walls. The roofing company worked mostly on the north side of the building but also on the west and east sides.

¶ 22        Plaintiff also paid $15,090 to a masonry company, which tuckpointed the north and west walls and repaired the southeast corner of the building. The trial court admitted, ultimately without objection[3], an invoice from the masonry company. The invoice indicates the masonry company

_____

[3] We say "ultimately" because defendants initially objected to the group exhibit containing the invoice based on a lack of foundation. After plaintiff laid more foundation, defendants did not object to the group exhibit's admission.

6

charged plaintiff $9942 to tuckpoint the north wall, $4998 to tuckpoint the west wall, and $150 to "[r]epair [the] southeast corner."

¶ 23                                   E. The Trial Court's Judgment

¶ 24        At the conclusion of trial, the court took the matter under advisement. A docket entry for June 22, 2021, indicates the court directed the parties "to submit law cases" by July 7, 2021. Plaintiff submitted a posttrial brief. The record contains no indication that defendants filed a brief.

¶ 25        On August 17, 2021, the court called the matter for decision. The court entered judgment in plaintiff's favor and awarded $34,086.50 in damages, which consisted of $12,650 in unpaid rent and late fees and $21,436.50 for the cost of restoring the property. Relevant here, the court awarded plaintiff $15,090 for tuckpointing and $2168 for roof repair. The record does not contain a report of the proceedings or an acceptable substitute (see Ill. S. Ct. R. 323 (eff. July 1, 2017)), but the court's written order states the parties' attorneys were present and the judgment was "based on the evidence presented and for the reasons stated in open court."

¶ 26                                   F. Defendants' Motion to Reconsider

¶ 27        Defendants moved to reconsider, requesting the court set aside the damages for the tuckpointing and roof repair. As to the tuckpointing, defendants noted that Richard testified no tuckpointing had been performed on the building since the 1980s. Defendant asserted tuckpointing must be performed every 15 to 20 years to avoid damage to the masonry. (The record contains no evidence to support this assertion.) Defendants emphasized the fact that no tuckpointing had been done in more than 30 years. They argued this suggested the damage to the masonry was likely caused by normal wear and tear and needed repairs before Goodberlet took possession. Further, defendants pointed out that plaintiff "failed to call anyone involved in the repair to the masonry work to testify that the damage was due to a leak in the roof rather than normal wear and tear."

7

Defendants also took issue with the lack of testimony about the specific tuckpointing work performed, arguing $15,090 was "exorbitant" and "must have been for more extensive masonry work than simply for a couple walls damaged by a leak."

¶ 28    Defendants also noted paragraph 6 of the lease contained seemingly contradictory language. It required defendants to "keep and maintain all portions of the property *** in good condition and repair including *** all necessary repairs *** to the walls, *** and interior and *exterior walls* of the Property." (Emphasis added.) But it also required plaintiff to "maintain and make all necessary repairs *** to *the building exterior*." (Emphasis added.) Thus, defendants argued, the lease obligated plaintiff to make all necessary repairs to the building's exterior, and plaintiff failed to present evidence to show what work was performed on the inside or outside of the building.

¶ 29    As to the roof repair, defendants raised a similar argument. They noted Richard's testimony that the roof had not been worked on for several decades and asserted "it [was] very likely that the roof had deteriorated and was in need of repair" before Goodberlet took possession. Defendants also pointed to the absence of evidence showing what specifically was repaired or the condition of the roof before defendants took possession. Thus, they argued, plaintiff failed to establish that the roof leak occurred after Goodberlet took possession.

¶ 30    On October 19, 2021, the court heard arguments on defendants' motion and took the matter under advisement. No report of the proceedings or acceptable substitute appears in the record.

¶ 31    On November 9, 2021, the court granted in part defendants' motion, striking the award of $2168 for the roof repair. It denied the motion in all other respects. Again, no report of the proceedings or acceptable substitute appears in the record.

¶ 32    This appeal followed.

8

¶ 33                                    II. ANALYSIS

¶ 34        On appeal, defendants challenge only the portion of the trial court's order that awarded
$15,090 in damages for tuckpointing. Specifically, defendants contend the award of damages for
the tuckpointing work was against the manifest weight of the evidence because plaintiff failed to
prove (1) the damage did not preexist defendants' possession of the property, and (2) the damage
was caused by defendants' breach, not normal wear and tear. Defendants ask that we either reverse
the damages award outright or remand the matter for the trial court to consider whether the wall
damage was caused by normal wear and tear.

¶ 35                                 A. Standard of Review

¶ 36        When reviewing a bench trial, we may disturb the trial court's judgment *only* if it is against
the manifest weight of the evidence. *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437,
¶ 23. A judgment is against the manifest weight of the evidence when the findings are
unreasonable, arbitrary, or not based on the evidence. *Id.* Under this standard, the appellate court
may not substitute its judgment for that of the trial court "regarding the credibility of the witnesses,
the weight to be given to evidence, or the inferences to be drawn," and we will affirm the judgment
provided the record contains any evidence supporting it. *Granville Tower Condominium Ass'n v.
Escobar*, 2022 IL App (1st) 200362, ¶ 27. Stated differently, "[a] reviewing court will not reverse
a trial court's decision merely because different conclusions can be drawn [from the evidence]; an
opposite conclusion must be clearly evident." *Walker v. Ridgeview Construction Co.*, 316 Ill. App.
3d 592, 595 (2000). This deferential standard of review is appropriate "because the trial court is in
a superior position to determine and weigh the credibility of the witnesses, observe witnesses'
demeanor, and resolve conflicts in their testimony." *Wade v. Steward Title Guaranty Co.*, 2017 IL
App (1st) 161765, ¶ 59.

9

¶ 37    However, we afford no deference to the trial court's conclusions of law. See *Granville*, 2022 IL App (1st) 200362, ¶ 27. Thus, to the extent this appeal requires us to construe the terms of the lease, our review is *de novo*. *Id.*; *Midway Park Saver v. Sarco Putty Co.*, 2012 IL App (1st) 110849, ¶ 14 (appellate court reviews *de novo* the construction, interpretation, or legal effect of a lease).

¶ 38                                    B. The Lease

¶ 39                        1. *Obligation to Repair Wall Damage*

¶ 40    Initially, we note defendants, in their motion to reconsider, asserted paragraph 6 of the lease was contradictory. They noted paragraph 6 obligated Goodberlet to keep and maintain all portions of the property in good condition and repair and make all necessary repairs "to the walls, ceiling, floors, and interior and *exterior walls* of the [p]roperty." (Emphasis added.) At the same time, paragraph 6 obligated plaintiff to "maintain and make all necessary repairs *** to *the building exterior.*" (Emphasis added.) Defendants contended this was a "paradox" but offered no argument as to how to interpret the provision. Rather, they simply stated plaintiff was responsible for the exterior of the property. In their brief to this court, however, defendants abandoned their argument that paragraph 6 was contradictory, and at oral argument, we raised this issue with the parties. Defendants agreed the provision was contradictory but offered no suggestion as to the effect of that contradiction. Instead, defendants have at all times argued in this court under the assumption that they were obligated by paragraph 6 to repair the damage to the inside and outside of the building's exterior walls.

¶ 41    Defendants have forfeited any argument regarding the contradiction in paragraph 6 and, further, any contention that plaintiff, not defendants, was generally responsible for maintaining the exterior walls of the building. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are

10

forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Accordingly, we will analyze this appeal under the same assumption, *i.e.*, the lease generally obligated defendants to repair the inside and outside of the building's exterior walls.

¶ 42                    2. *Normal Wear and Tear*

¶ 43    Defendants' argument in this court rests primarily on the premise that the lease did not require them to repair damage caused by normal wear and tear. Under the common law, a tenant has no obligation to repair damage caused by normal wear and tear. *Ikari v. Mason Properties*, 314 Ill. App. 3d 222, 228 (2000). However, the parties to a lease may modify the common law, as long as the warrant for any change is plainly discoverable in the lease. *Quincy Mall, Inc. v. Kerasotes Showplace Theatres, LLC*, 388 Ill. App. 3d 820, 824 (2009).

¶ 44    Though the lease is not a model of clarity, we agree with defendants that they had no duty to repair the damage to the walls *if* the damage was caused by normal wear and tear. The lease modified the common-law rule that a tenant is generally not responsible for repairs, replacements, or alterations that are structural or substantial in nature (see *id.*) and placed on Goodberlet the obligation to make all necessary repairs, replacements, or alterations to the exterior walls of the property (but not other substantial repairs, like the roof). But, as defendants point out, the lease makes no mention of which party is obligated to repair damage caused by normal wear and tear.

¶ 45    Courts presume that parties enter into contracts with knowledge of the existing law as it relates to their agreement. *LOMTO Federal Credit Union v. 6500 Western LLC*, 2018 IL App (1st) 173106, ¶ 21. Thus, in the absence of contrary language, the laws existing at the time and place of the contract's execution become implied terms of the contract. *S & D Service, Inc. v. 915-925 W. Schubert Condominium Ass'n*, 132 Ill. App. 3d 1019, 1023 (1985)).

¶ 46    Here, the lease contained no language excluding the common-law rule that a tenant is not obligated to make repairs made necessary by normal wear and tear. See *Ikari*, 314 Ill. App. 3d at 228. We must presume the parties executed the lease with knowledge of this well-settled law, and it therefore became an implied term of the contract. *S & D Service*, 132 Ill. App. 3d at 1023. We acknowledge paragraph 6 of the lease placed on Goodberlet the obligation to make "*all* necessary repairs *** to the *** exterior walls." (Emphasis added.) But because paragraph 6 of the lease makes no mention of causation, this language was not a plainly discoverable modification of the common-law rule. See *Quincy Mall*, 388 Ill. App. 3d at 824 (a modification is plainly discoverable when the provision warranting the change is clear and unambiguous). With this in mind, we turn to whether the damages award was against the manifest weight of the evidence.

¶ 47    C. The Damages Award Was Not Against the Manifest Weight of the Evidence

¶ 48    As noted, defendants argue they cannot be held liable for the damage to the walls because plaintiff failed to prove the damage was caused by their breach, as opposed to normal wear and tear, and, therefore, the damages award was against the manifest weight of the evidence. They ask for two distinct remedies—an outright reversal of the tuckpointing damages or a remand for the trial court to consider whether the wall damage was caused by normal wear and tear.

¶ 49    We first briefly address and reject defendants' request that we remand the matter to the trial court so it can consider whether the damage was caused by normal wear and tear. Defendants' request suggests the trial court, when it imposed damages, did not consider normal wear and tear.

¶ 50    The problem with defendants' request is that the record provides no basis on which we can conclude the trial court did not consider the issue of normal wear and tear. The court's August 17, 2021, docket entry states that judgment was entered in favor of plaintiff "based on the evidence presented and for the reasons stated in open court." The record, however, does not contain a

12

verbatim transcript of those proceedings or an acceptable substitute under Illinois Supreme Court Rule 323 (eff. July 1, 2017). Because the record is incomplete, we must resolve any doubts in favor of plaintiff, and we presume the court considered whether the damage was, in fact, caused by normal wear and tear and concluded it was not. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 51     We conclude the trial court's damages award for the repairs to the north and west walls was not against the manifest weight of the evidence. Under plaintiff's theory of its case, had Goodberlet not vacated the property before the lease expired, Goodberlet would have discovered the roof leak and could have notified plaintiff to make repairs before the leak caused damage to the walls. Richard testified that plaintiff purchased the property in the mid-eighties and operated its family electrical business there until September 2017, when it sold the business and leased the property to Goodberlet. Richard worked at the property six days a week for several years and routinely inspected the property for necessary repairs, and he did so again just before Goodberlet took possession. At no time before Goodberlet took possession did Richard observe any indication that the roof was failing or that the exterior walls needed repairs. Goodberlet took possession and, for about 10 months, operated the electrical business. In August 2018, however, Goodberlet placed signs on the property indicating that it had moved or was moving the operation. Also in 2018, Richard observed Alejandre's father removing shelving from the building.

¶ 52     Richard also testified that, at the end of the lease, he entered the property and discovered water-soaked furniture and ceiling tiles, as well as water damage to the ceilings and walls. Based on his experience, the water damage caused by a leaking roof. He also observed loose mortar, bricks, and blocks on the exterior walls near where he observed the water damage. The trial court

13

admitted into evidence photographs, which showed what appears to be water damage to the ceiling in the office and to the inside and outside of the exterior wall.

¶ 53 Richard further testified that plaintiff paid a roofing company to repair multiple leaks at the joint between the parapet wall on the north, west, and east sides of the building. It also paid a masonry company to tuckpoint the north and west walls and repair the southeast corner of the building, and the trial court admitted into evidence an invoice showing the company charged plaintiff a total of $15,090, which consisted of $9942 to tuckpoint the north wall, $4998 to tuckpoint the west wall, and $150 to "repair" the southeast corner.

¶ 54 Based on this evidence, the trial court could reasonably infer that (1) Goodberlet vacated the property approximately one year before the end of the lease; (2) water began infiltrating multiple unreported roof leaks during the lease term; (3) the water caused damage to the north and west exteriors wall of the building; (4) the tuckpointing was necessary to repair the wall damage; and (5) had Goodberlet not vacated early, it would have discovered the leaks and could have reported those leaks to plaintiff before the water caused any further damage. Accordingly, we conclude the trial court's award of damages for the tuckpointing to the north and west walls was not against the manifest weight of the evidence.

¶ 55 That said, we find the record contains no evidence from which the trial court could infer that defendants' breach caused the damage to the southeast corner of the building. At trial, Richard's testimony established the roof leaks were primarily on the north side of the building, but also on the west and east sides, and that there was water damage on the walls near the leaks. However, Richard provided no testimony that the roof was also leaking on the south side of the property, such that a leak would have caused damage to that portion of the wall. Accordingly, we reduce the trial court's judgment by $150.

14

¶ 56    Defendants nevertheless argue that the record supported a conclusion that their early departure from the premises did not cause the wall damage. They emphasize Richard's testimony regarding the age of the property, the lack of tuckpointing on the property since plaintiff's purchase, and his lack of knowledge concerning how often tuckpointing should be performed on such buildings. Based on this evidence, defendants contend, the trial court should have found the wall damage either preexisted their possession of the property or was caused by normal wear and tear.

¶ 57    The record contains no evidence from which the trial court could conclude the damage preexisted defendants' possession of the property. Richard's unrebutted testimony compelled the opposite conclusion. He testified that, before Goodberlet took possession, he never observed any indication that the roof was leaking or the walls were damaged.

¶ 58    We do not necessarily disagree that the age of the building and the lack of any prior tuckpointing work could weigh in favor of a finding that the wall damage was caused by normal wear and tear. However, as noted above, the evidence also supported a finding that it was not.

¶ 59    Defendants also point out the lack of expert testimony as to what caused the damage to the walls, suggesting plaintiff was obligated to present expert testimony to establish causation. Defendants offer no citation of authority for that suggestion, and it is therefore forfeited. *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19.

¶ 60    Essentially, defendants ask this court to reweigh the evidence and draw a different inference than that drawn by the trial court. Our standard of review precludes us from doing so. *Granville*, 2022 IL App (1st) 200362, ¶ 27. Here, the record contains evidence supporting the trial court's award of damages insofar as they relate to the north and west walls of the property, and, therefore, we affirm as modified the trial court's judgment. *Id.*

¶ 61                                   III. CONCLUSION

¶ 62          For the reasons stated, we affirm as modified the judgment of the circuit court of Kankakee

County.

¶ 63          Affirmed as modified.