2023 IL App (1st) 230183-U

SECOND DIVISION
December 19, 2023

No. 1-23-0183

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 88 CR 18817-01 |
| | ) | |
| JAMES MARSHALL, | ) | Honorable |
| | ) | Sophia Atcherson, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

ORDER

¶ 1   *Held*:   The judgment of the circuit court of Cook County is affirmed; the trial court exercised discretion in ruling on defendant's motion to suppress his written confession, the trial court's judgment admitting evidence of torture by police who did not participate in defendant's interrogation as impeachment evidence was not an abuse of discretion, and the trial court's credibility determinations and judgment are not against the manifest weight of the evidence.

¶ 2   Theresa Quinn was murdered in 1988 at the age of 14. Defendant signed a confession to Theresa's murder. Prior to trial, defendant filed a motion to suppress that confession on the ground the confession was involuntary because police obtained it through physical abuse and coercion. The circuit court of Cook County denied defendant's motion to suppress, the matter proceeded to a bench trial, and, following trial, the court convicted defendant of first degree

murder and sexual abuse. In the first appeal of defendant's conviction to this court (*Marshall I*) we affirmed defendant's conviction and sentence for the crime.

¶ 3     Almost 30 years later, after systemic torture and abuse by police under the Command of John Burge was established, a Special Master determined that defendant has a valid claim of police brutality, and the circuit court appointed counsel to represent defendant in postconviction proceedings. Defendant filed a petition for postconviction relief seeking, in pertinent part, a finding that defendant's confession was involuntary and secured in violation of defendant's constitutional rights.

¶ 4     Subsequent proceedings led to vacatur of defendant's conviction and a new hearing on defendant's motion to suppress, which the trial court granted, and the State appealed.

¶ 5     For the following reasons, we affirm the trial court's judgment.

¶ 6                              BACKGROUND

¶ 7     Defendant's petition for postconviction relief proceeded to a third-stage evidentiary hearing. After that hearing, the postconviction court granted defendant's petition for postconviction relief. Specifically, the postconviction court found that defendant made a substantial showing that the outcome of the hearing on defendant's pretrial motion to suppress his confession likely would have been different had evidence of a pattern of abusive interrogation tactics been available to impeach the testimony of the officers who interrogated defendant and obtained his confession.

¶ 8     The postconviction court vacated defendant's conviction and remanded the case for a new suppression hearing that included evidence of a pattern and practice of abuse and coercion and, depending on the outcome of the new suppression hearing, a new trial. The State appealed the trial court's judgment granting defendant postconviction relief. In the second appeal of

defendant's conviction to this court (*Marshall II*) we affirmed the postconviction court's judgment vacating defendant's conviction and remanding the case for a new hearing on defendant's motion to suppress his confession.

¶ 9    After the order on defendant's postconviction petition the State announced its intention to retry defendant. By then, defendant had served (with the use of the then applicable day-for-day good conduct credit) the full term of the sentence originally imposed on the convictions for first degree murder and sexual abuse. Defendant filed a motion to dismiss the indictment against him on the ground he should not be convicted for the same conduct giving rise to the vacated convictions because to do so would expose defendant to double jeopardy in violation of his due process rights and would be a "useless act" that is not equitable nor productive. The trial court denied the motion to dismiss the indictment and defendant appealed that judgment. In the third appeal of defendant's conviction to this court (*Marshall III*) we affirmed the trial court's judgment denying defendant's motion to vacate defendant's indictment (effectively allowing the matter to proceed to a new hearing on defendant's motion to suppress).

¶ 10    In June and August 2023, the trial court held a new hearing on defendant's motion to suppress his confession. The new hearing focused on evidence of an alleged pattern and practice of abuse and coercion by the police officers who interrogated defendant and obtained his written confession. Defendant concedes much of the evidence presented at the new suppression hearing was presented and considered in connection with the evidentiary hearing on defendant's petition for postconviction relief with only some additional testimony at the new suppression hearing. This court provided a detailed discussion of the evidence of a pattern and practice of abuse by the police officers involved in this case in *Marshall II* and we will not repeat it here.

¶ 11    Defendant states that new evidence in support of his claim can be categorized as (1) findings by the Torture Inquiry and Relief Commission (TIRC), (2) a July 2006 report by Special State's Attorneys Egan and Boyle, (3) a report from the city of Chicago Office of Professional Standards (OPS) (figuratively referenced as the Goldston report), (4) admissions by the city of Chicago, and (5) evidence related to civil complaints against the city based on misconduct by the police officers involved in defendant's interrogation and other officers.

¶ 12    Of the new evidence, the State complains about evidence in the form of exhibits defendant sought to use to supplement his motion to suppress concerning complaints by other defendants against different police officers than in this case or which contained no specific allegations of misconduct by officers who were involved in defendant's arrest and interrogation. Those exhibits became the subject of the State's motion *in limine* to "Preclude Consideration of Inadmissible Evidence of Other Acts." The State's motion *in limine* argued that the exhibits at issue were irrelevant and inadmissible because they consisted of nonfinal determinations by the TIRC, involved different police officers, different conduct and circumstances, or only addressed monetary settlements without any context. The State's motion *in limine*, which is the basis of this appeal, relied primarily on our supreme court's decision in *People v. Jackson*, 2021 IL 124818 (citing *People v. Patterson*, 192 Ill. 2d 93 (2000)).

¶ 13    Specifically, the State's motion argued that defendant's exhibits include TIRC case dispositions, court opinions in unrelated cases, and testimonies of unrelated third parties. The State asserted that numerous exhibits refer to cases by defendants against police officers who were not involved in defendant's interrogation and monetary settlements in other cases without explanation of their relevance to this case. The State argued that several of defendant's exhibits have no bearing on whether the police officers named in defendant's motion to suppress behaved

in conformity with the information in the exhibits when they interrogated defendant, and that other exhibits relate to civil suits involving different conduct and different police officers from those named in the instant motion. Therefore, the State argued, those exhibits are irrelevant to the determination of whether the police officers involved in defendant's interrogation were involved in a pattern and practice of abuse and coercion or are inadmissible impeachment evidence. Additionally, the State argued that many of defendant's exhibits are civil complaints without any showing that those complaints resulted in findings of abuse by police officers who interrogated defendant and, therefore, they are similarly irrelevant to a showing of a pattern or practice of abuse and coercion.

¶ 14     The State's motion listed 32 group and individual exhibits that the State asked the trial court to bar from admission into evidence at the new hearing on defendant's motion to suppress. Separately, the State's motion argued TIRC dispositions are not competent impeachment evidence because a TIRC disposition is not evidence that torture occurred but rather is a step in the procedure in bringing a claim of torture before the court.

¶ 15     Before trial, the trial court stated on the record it had spoken with the parties and all agreed the hearing could proceed before the court ruled on the motion, "and if there is a ruling that affects anything I hear today I certainly can disregard it." The trial court stayed ruling on the motion and allowed the hearing to proceed. Following arguments by the parties, the trial court stated it wanted more time to review defendant's exhibits. The court stated it was still considering the State's motion to bar defendant's exhibits. The court then stated:

> "At this time, I do believe that the defendant should be allowed to have
>
> those exhibits admitted, and that to the extent that they—it could be argued that
>
> allegations differ or should be questioned, the court will certainly consider that in

terms of the weight given to that testimony, but I am going to allow the evidence of pattern and practice, and I do consider—I am going to consider that in making my ruling."

¶ 16 In its subsequent oral ruling, the trial court stated, as it pertains to this appeal, as follows:

"In addition to the testimony, there was information and exhibits presented to the court in terms of pattern and practice of abuse. Some of that pattern and practice related specifically to the detectives involved in this case including information and exhibits submitted regarding [other defendants in] the Gibson matter, Reeves, Kitchen, Hampton, Kluppelberg and Johnson and others. I think it's notable in the Reeves case there was a threat to throw him out the window as those raised by [defendant] here.

In addition, the volumes of exhibits *** of general pattern and practice of abuse *** and this additional pattern and practice evidence in the court's mind adds context and color to the lens through which I view and the court views detectives had no knowledge of any abuse at area three, no knowledge of any abuse by *** Burge or other detectives serving under him.

While some acknowledge knowing about an investigation *** at some point almost all *** claimed no knowledge of any of the reports or conclusions reached in those reports, no knowledge or awareness of the city of Chicago's acknowledgement of the pattern and practice of abuse ***. Indeed, some detectives claim no knowledge of allegations of abuse and lawsuits filed against them ***.

So the pattern and practice evidence is not whether abuse happened in this case. It's also how to view the credibility of law enforcement witnesses who testify in this case. Case law makes it clear courts can consider not only allegations as to the conduct by specific officers but whether those officers did intervene [while] abuse was taking place. There are other allegations of abuse as noted by the detectives in this case against other suspects and witnesses.

\* \* \*

I find it hard to believe this systemic abuse that was occurring at area three was never observed, talked about or even suspected by any of the witnesses called by the State."

¶ 17    Although the contested exhibits are the only evidence pertinent to our disposition, there is no need to engage in a detailed recitation of this evidence because for the reasons stated below, the State's arguments based on the evidence are insufficient to carry the State's burden on appeal.

¶ 18    The  trial court granted defendant's motion to suppress his confession. This appeal by the State, under a Certificate of Substantial Impairment, followed.

¶ 19                                ANALYSIS

¶ 20    The State's central argument on appeal is that the trial court abused its discretion by admitting defendant's exhibits as evidence of a pattern and practice of abuse and coercion by the police officers who interrogated defendant and/or to impeach the State's witnesses involved in securing his confession for three reasons. First, the State argues the trial court abused its discretion because it failed to exercise any discretion before admitting the exhibits. Second, if the trial court exercised any discretion at all, it abused its discretion in admitting the exhibits because

nearly all of the exhibits are inadmissible under governing case law, specifically *Jackson*, 2021 IL 124818, *People v. Nelson*, 235 Ill. 2d 386, 421-22 (2009), and *People v. Hughes*, 2015 IL 117242. Third, the trial court abused its discretion because it made credibility determinations concerning the State's witnesses based on the exhibits that it should not have admitted in the first place and because its judgment was partially against the manifest weight of the evidence.

¶ 21                    THE TRIAL COURT EXERCISED DISCRETION

¶ 22     As to the first issue, the State argues the trial court "failed to conduct any analysis" of the proffered evidence to determine its admissibility under existing case law "and instead simply admitted all of defendant's proffered exhibits as both substantive evidence and impeachment without any explanation or consideration of the People's arguments." While it is true that "the trial court's failure to exercise discretion, where it has discretion, is itself an abuse of discretion" (*People v. Hilliard*, 2022 IL App (1st) 200744, ¶ 24), in this case the record establishes that the trial court did not abuse its discretion in this way.

¶ 23     The exhibits at issue could not be admitted into evidence without some finding of their relevance. *People v. Anderson*, 2023 IL App (1st) 200462, ¶¶ 177-179. "The question of relevancy is a determination to be made by the trial court after a consideration of, *inter alia,* the defendant's allegations of torture and their similarity to the prior allegations." *People v. Patterson*, 192 Ill. 2d 93, 144-45 (2000). The State has pointed to no evidence the trial court believed that it had no discretion and that admission of defendant's exhibits was mandated by the facts of this case. See *Seymour v. Collins*, 2015 IL 118432, ¶ 50 (finding it did not appear the trial court exercised its discretion believing instead that challenged ruling was mandated by the presence of certain facts). The trial court's statements indicate its awareness that it could deny admission of defendant's exhibits and that the court considered the State's arguments against

admission. See *Seymour v. Collins*, 2014 IL App (2d) 140100, ¶ 39, reversed on other grounds, 2015 IL 118432 (rejecting argument trial court failed to exercise discretion where "the trial court stated that it had reviewed the '[m]otion, *** exhibits, *** and *** arguments' ").

¶ 24    In this case, the trial court indicated that it did not automatically admit defendant's exhibits but that it considered the exhibits to determine their relevancy and the appropriate weight to give them. Before the hearing began, without a ruling on the State's motion, the trial court stated that "if there is a ruling that affects anything I hear today I certainly can disregard it." In other words, if the trial court deemed an exhibit inadmissible it would ignore that exhibit and any testimony about that exhibit. At the hearing, when the State objected to the admission of an exhibit, the court inquired whether defendant was "establishing a pattern and practice—is there an allegation with respect to [a different defendant's] case *** with respect to this [police officer-witness] that you're saying is similar to the extent that it could be seen to be a pattern of behavior with respect to this witness?" The court ruled that it would "hear the evidence, and upon my re-examination of the evidence and the motions *in limine*, I'll determine whether or not it should be considered by the court in the ruling on the ultimate issue in this *** motion." The court repeatedly indicated that "[i]f, in fact, I determine that [an exhibit] is not proper, then I am able to disregard it as far as any ultimate decision that I reach." Ultimately, the court ruled that it would "allow counsel to admit the pattern and practice evidence and exhibits and should I, in my review, determine that some of those exhibits are not relevant to the allegations present, then I will disregard them."

¶ 25    In its oral ruling, the trial court stated it had "review[ed] volumes of Exhibits with respect to prior proceedings and other pattern and practice material."

¶ 26    The trial court in this case also indicated its awareness of the standards by which pattern and practice evidence can be admitted when the court noted on the record that "[s]ome of that pattern and practice [evidence] related specifically to the detectives involved in this case" and that "this additional pattern and practice evidence *** adds context and color to the lens through which I view" the testimony. The trial court had previously stated its awareness that pattern and practice evidence involving other officers and/or defendants could be admitted under certain circumstances. See *People v. Patterson*, 192 Ill. 2d 193, 145 (2000) (question for court in hearing to determine whether torture allegation warrants a new trial are "whether (1) any of the officers who interrogated defendant may have participated in [the] systemic and methodical interrogation abuse present at Area 2 and (2) those officers' credibility at the suppression hearing might have been impeached as a result."). See also *Marshall II*, 2019 IL App (1st) 190441-U, ¶ 86 (holding "the trial court's judgment that defendant's claims are 'sufficiently similar in time place and manner' to establish a pattern of abuse that, if available at the suppression hearing, might have impeached the detectives involved in his case, is not against the manifest weight of the evidence"). For the reasons discussed in greater detail below, we find the trial court did not misapply the law.

¶ 27    In this case the record clearly refutes the State's contention that the trial court failed to exercise any discretion at all. This argument fails.

¶ 28                    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

¶ 29    Next, the State argues that under *Jackson*, *Nelson*, and *Hughes*, the trial court abused its discretion by admitting defendant's exhibits where "they either involved different officers or consisted of *** a multi-defendant civil lawsuit where one of the named detectives was listed as a defendant." The State argues that the admissibility of substantive or impeachment evidence of

a pattern and practice of abuse by a police officer is dependent upon the presence of two factors: (1) specific allegations of wrongdoing by that officer (including "direct and personal involvement with the defendant's arrest or interrogation" such that the police officer could be "equally culpable for the misconduct as was [another] named detective") or a judicial finding of wrongdoing by that officer; and (2) the officer that is the subject of the proffered evidence is specifically named in the motion to suppress before the court.

¶ 30     This court has recognized that:

"In *Patterson*, the supreme court held that a defendant has presented sufficient evidence at the pleading stage to warrant further postconviction proceedings where (1) the defendant consistently claimed he was tortured, (2) his claims of torture were and always had been similar to other claims depicted in the new evidence, (3) the officers identified in the evidence were the same officers in the defendant's case, and (4) the defendant's allegations were consistent with documented findings of torture against the officers." *People v. Vidaurri*, 2023 IL App (1st) 200857, ¶ 42-43 (citing *Patterson*, 192 Ill. 2d at 140).

¶ 31     In *Jackson*, our supreme court held that in its earlier decision in *Patterson*, the court found that evidence of police misconduct is relevant to a defendant's claim that he was tortured when "the defendant in that case had consistently claimed he was tortured, that the defendant's allegations were consistent with documented findings of torture against the same officers who were involved in obtaining the defendant's confession, that the other instances of torture occurred at or near the time of the defendant's allegations, and that the other instances of torture involved similar methods of abuse." *Jackson*, 2021 IL 124818, ¶ 32. The *Jackson* court also noted that:

"similarity is a critical factor to consider when determining whether new evidence of police misconduct in other cases establishes a pattern and practice of certain behavior. However, the test is not one of exact or perfect identity. Rather, the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases, *such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior*. This determination will necessarily depend on the unique facts of each case." (Emphasis added.) *Jackson*, 2021 IL 124818, ¶ 34. The *Jackson* court only addressed the civil lawsuits that identified the detectives who interviewed a witness in the *Jackson* defendant's case. *Id*. ¶ 36.

¶ 32     Where the evidence is used to establish that the police officers involved in the defendant's interrogation engaged in conduct consistent with a pattern or practice of abuse against the defendant, the State is correct that evidence of torture by officers with no involvement with the defendant's interrogation is irrelevant under *Jackson*. But see *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 103 ("even if the new evidence established only that Pienta stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether Pienta's *credibility* may have been impeached as a result of this evidence." (Emphasis added.)).

¶ 33     Regarding the alleged requirement of a specific finding of wrongdoing, the court has held that "the primary inquiry in deciding the relevance of prior allegations is whether they are factually dissimilar to the officer's conduct in the pending case." *People v. Anderson*, 2023 IL App (1st) 200462, ¶ 192 (citing *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 17). The *Jackson* court did state that "mere evidence of a civil suit against an officer *charging* some

breach of duty unrelated to the defendant's case does not raise an inference of bias or motive to testify falsely and "is not admissible to impeach the officer." *Jackson*, 2021 IL 124818, ¶ 38. However, the *Jackson* court did not require a specific *finding* of wrongdoing. See *id*. ¶¶ 36-38. The *Jackson* court only required that the civil suits provide enough information to determine whether the officers named in the lawsuit were alleged to have engaged in the type of behavior alleged in the torture allegation. *Id*. ¶ 36 ("Because there is no way to determine from this document if either Forberg or Foster engaged in any witness intimidation or coercion, this complaint has no probative value in establishing a pattern and practice of misconduct relevant to this case.").

¶ 34    The proffered evidence must charge the officer before the court with some breach of duty related to the defendant's case to establish that officers were acting in conformity with a pattern and practice of behavior. *Id*. ¶ 37-38. However, there is no general blanket requirement that a prior civil suit include an express finding of wrongdoing by the witnesses presently before the court. The pertinent relevance inquiry is whether the evidence presents conduct that is "sufficiently similar" to defendant's alleged abuse; but the similarity of past allegations of police misconduct does not depend on whether the officer was ever disciplined. *Anderson*, 2023 IL App (1st) 200462, ¶ 189-92 (citing *Jackson*, 2021 IL 124818, ¶ 34 (citing *Patterson*, 192 Ill. 2d at 144-45)).

¶ 35    Thus, the State is partially correct in that a judicial finding of wrongdoing by the officer depends on the particular facts of the case. *Jackson*, 2021 IL 124818, ¶ 34-37 (whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases will "necessarily depend on the unique facts of each case" and noting

absence of findings of wrongdoing in "other civil lawsuit" where, in summary judgment proceeding on stipulated facts, "the [officer's] treatment of [the] witness was disputed").

¶ 36    With this framework in mind, looking to the State's claims on appeal, the State complains that none of defendant's exhibits involve conduct—either directly or indirectly[1]—by the police officers who interrogated defendant and, therefore, they were all inadmissible. However, the State does not specify for what purpose the trial court relied on those exhibits. This is a critical distinction.

¶ 37    Evidence of prior instances of torture, abuse, and coercion may be used to establish that police were presently acting in conformity with that pattern or practice. *Jackson*, 2021 IL 124818, ¶ 34. However, as noted by defendant, the exhibits were also admissible for a purpose other than to establish conduct consistent with a pattern and practice of abuse and coercion by the officers who interrogated defendant. The trial court used the exhibits to gauge the credibility of the State's witnesses. The trial court stated that the exhibits involving different police officers "adds context and color to the lens through which I view and the court views detectives had no knowledge of any abuse at area three, no knowledge of any abuse by *** Burge or other detectives serving under him" as a matter of the witness's credibility.

---

[1]    See *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 190 ("the allegations of abuse by Detectives Foley, O'Brien, Boudreau, and Halloran show a pattern and practice of misconduct, in which these detectives acted in concert to coerce suspects and witnesses into providing false statements. All these factors link the evidence of abuse to defendant's claim that he was beaten into confessing."); *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 103 ("even if the new evidence established only that Pienta stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether Pienta's credibility may have been impeached as a result of this evidence.").

¶ 38 The question of whether evidence is relevant to establish a pattern and practice of abuse is separate from the question of whether evidence bears on a witness's credibility. See *Anderson*, 2023 IL App (1st) 200462, ¶ 175 (discussing *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 113 ("*Whirl* confirms that it is error for the court to focus on defendant's credibility, instead of assessing whether the new evidence would likely have altered the result of the suppression hearing. [Citation.] Nevertheless, *Whirl* indicates that this error does not end our review where, as here, the trial court also made specific findings regarding the new evidence offered to show a 'pattern and practice' of abuse and coercion.") See also *Nelson*, 235 Ill. 2d at 421-22 (lawsuit must have some relationship to pending case to be relevant to impeach witness; "the evidence used to impeach must raise an inference that the witness has something to gain or lose by his testimony; the evidence must not be remote or uncertain" (citing *People v. Coleman,* 206 Ill. 2d 261, 278 (2002))); *People v. Myers*, 2023 IL App (1st) 210642, ¶ 56 ("Prior inconsistent statements, where not otherwise admissible as substantive evidence, are sometimes admissible to undermine the credibility of a witness.").

¶ 39 The court has stated that "[m]ere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case is not admissible to impeach the officer." See, *e.g.*, *Jackson*, *Coleman*, 206 Ill. 2d at 279. The focus of the relevance inquiry is on the relationship of the civil suit to the witness's motive to testify falsely. *Jackson*, 2021 IL 124818, ¶ 34 ("critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct showing in other cases"). See also *Coleman*, 206 Ill. 2d at 279-82 (and cases cited therein discussing various motives to testify falsely arising from witness's prior misconduct and distinguishing impeachment material the defendant in *Coleman* proposed to use in cross-examination). The question is whether the evidence will "give rise to an

inference that the witness has something to gain or lose by his testimony." *Coleman*, 206 Ill. 2d at 278 (citing *People v. Bull*, 185 Ill. 2d 179, 206 (1998)). "[T]he evidence must not be remote or uncertain." *Id.*

¶ 40    We find there is no prohibition on the trial court's use of exhibits related to cases involving police officers other than those who interrogated defendant as evidence of a pervasive pattern and practice of torture similar to that defendant alleged he encountered to impeach the witness's testimony. See *Tyler*, 2015 IL App (1st) 123470, ¶ 190. The only requirement is that the evidence is not remote or uncertain on the issue of the witness's credibility which, in this case, it was not; and the State does not contend it was. Earlier in this case, in *Marshall II*, this court accepted defendant's argument that "under *Tyler* and *Whirl*, evidence of past abuse by officers is relevant even if they are not the officers who abused defendant." *Marshall II*, 2019 IL App (1st) 190441-U, ¶¶ 84, 86. We reject the State's claim those decisions have no bearing on this case after our supreme court's decision in *Jackson*. We find that *Jackson* does not abrogate our findings in *Marshall II*.

¶ 41    In this case, nowhere in the trial court's judgment does the court indicate it relied on any of defendant's exhibits involving different officers as direct evidence the police officers in this case engaged in a pattern and practice of torture. In its oral ruling, the trial court delineated between the exhibit evidence involving the police officers who interrogated defendant and a "general pattern and practice of abuse, either [by] Commander Burge or detectives that worked under his command." The court demonstrated its understanding of the distinction between these two categories of evidence, *i.e.,* evidence of torture by the officers involved in this case and evidence bearing on the credibility of the witnesses—and specifically the witness's credibility as

to only one factual assertion—that the witnesses were unaware of torture at their police station. The court specifically stated:

> "[T]this additional pattern and practice evidence in the Court's mind adds context and color to the lens through which I view and the Court views detectives had no knowledge of any abuse at area three, no knowledge of any abuse by *** Commander Burge or other detectives serving under him at area three."

¶ 42    The trial court disavowed using the pattern and practice evidence related to other defendants and police officers as evidence the police officers in this case abused and coerced defendant. The court stated: "So the pattern and practice evidence is not whether abuse happened in this case. It's how to view the credibility of law enforcement witnesses who testify in this case. Case law makes it clear courts can consider not only allegations as to the conduct by specific officers but whether those officers did intervene [when] abuse was taking place. There are other allegations of abuse as noted by the detectives in this case against other suspects and witnesses."

¶ 43    The State's reliance on *Hughes*, 2015 IL 117242, is misplaced. In *Hughes*, our supreme court held that the defendant in that case forfeited certain arguments in support of a motion to suppress where the defendant's "reasons for suppression in the trial and appellate courts *** are almost wholly distinct from one another." *Hughes*, 2015 IL 117242. The same "concerns motivating the doctrines of forfeiture and waiver" that were present in *Hughes* are not present in this case. Defendant has consistently alleged a pattern and practice of abuse and coercion at the police station where he was interrogated including abuse and coercion by the officers involved in his questioning. Moreover, regardless of whether defendant specifically named the parties involved in some of his exhibits in his original motion to suppress, the trial court demonstrably

did not use that evidence as substantive evidence that police did torture defendant but rather as evidence bearing on the credibility of witnesses defendant named in his motion. We find *Hughes* inapposite.

¶ 44    The trial court did not abuse its discretion in admitting defendant's exhibits for the purpose stated in the trial court's judgment. The State's argument, that exhibits involving police officers other than those specifically named in defendant's motion to suppress are inadmissible, fails. We find no abuse of discretion because the trial court properly stated and applied the law in admitting and using the contested exhibits. Compare *Anderson*, 2023 IL App (1st) 200462, ¶ 182 ("The trial court apparently conflated the question of whether prior allegations were *relevant* with whether it found they were *credible*, disregarding much of the pattern and practice evidence based on its credibility determinations.").

¶ 45    THE JUDGMENT IS NOT AGAINST THE MANIFEST WEIGHT OF THE

EVIDENCE

¶ 46    Finally, the State argues the trial court's judgment granting defendant's motion to suppress is against the manifest weight of the evidence because the court's judgment relied on the inadmissible exhibits, was premised on an inaccurate recollection of the evidence, and defendant's testimony was patently incredible. The State has failed to carry its burden as to each of its arguments.

"A judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence or when an opposite conclusion is apparent. [Citation.] Under this standard of review, the appellate court gives deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and

witnesses and achieves a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. [Citation.] The appellate court therefore does not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to evidence, or the inferences to be drawn. [Citation.] Accordingly, the trial court's judgment will be affirmed provided the record contains any evidence supporting it." *Granville Tower Condominium Ass'n v. Escobar*, 2022 IL App (1st) 200362, ¶ 27.

¶ 47 We recount the most relevant portions of the testimony to lend context to our decision that the trial court's judgment granting the motion to suppress—specifically in the context of the State's arguments on appeal and the trial court's judgment that the testimony at the hearing on the motion to suppress was impeachable on the basis of the witnesses' credibility as it pertains to torture and abuse at Area Three—is not against the manifest weight of the evidence.[2]

¶ 48 Former Assistant State's Attorney Dillon testified, in pertinent part, that in November 1988 he was assigned to the felony review unit of the Cook County State's Attorney's Office and had been assigned to that unit for approximately six months. On November 8, 1988, he was assigned to Area 3 and received a call to go to Area 3 Violent Crimes in regard to the murder of Theresa Quinn. Dillon had no independent recollection of events in November 1988 but, to prepare for his testimony in this case, Dillon reviewed several transcripts including his testimony at defendant's original motion-to-suppress hearing. Dillon interviewed defendant with Detective Vallandigham present.

---

[2] Detectives Ptak, Vallandigham, and Taylor were deceased at the time of the hearing. The State submitted the transcript of their testimony at defendant's motion to suppress hearing, which the trial court admitted. Obviously, then, none of them could have been shown any of the contested exhibits. According to the State, each detective "categorically denied abusing or mistreating defendant in any manner."

¶ 49     Defendant agreed to give Dillon a court-reported statement. Dillon testified that he had never run across a situation where a defendant gave a handwritten statement to a Chicago police detective that was ultimately used in evidence against the defendant and that he had never "heard of such a thing." Defendant gave his statement to Dillon with Detective Vallandigham present. Dillon testified that he never threatened or coerced defendant into signing each page of defendant's transcribed statement. Neither Dillon nor Vallandigham told defendant what to say. Defendant never told Dillon detectives beat him or held him out a window.

¶ 50     On cross-examination Dillon testified he knows that defendant did not tell Dillon that detectives had abused defendant because, Dillon testified, he would have never taken defendant's statement if defendant had told Dillon that information. Dillon had no independent recollection but testified he would not have taken a court reported statement from defendant if defendant had told Dillon that defendant was abused in any way.

¶ 51     Dillon testified he was retired from the State's Attorney's Office but he worked for the Cook County State's Attorney's Office for a little over 30 years before he retired. Dillon testified there were no policies and procedures for assistant state's attorneys in the felony review unit in 1988. The date of defendant's interview was not Dillon's first visit to Area 3, and he had visited all six Chicago Police Department areas by November 7, 1988.

¶ 52     Dillon testified he knew the name John Burge but Dillon never had any interaction with Burge. Dillon was not aware of where Burge worked "until many years after the fact" while Dillon was working in felony review. He did not know that Burge was the commander of Area 3 in November 1988. Dillon did not perceive that "there would be a problem if a detective complained about a felony review state's attorney's work. Dillon testified he has heard the phrase "code of silence" before but that he was not familiar with it in 1988. Dillon testified that

he did not have any personal knowledge that in 1988 there was a "code of silence" in the Chicago police department. In the months that Dillon had been assigned to felony review in November 1988, he never witnessed a suspect being hit, never saw a suspect being threatened, and in his interviews never suspected that a suspect had been beaten. In fact, in his entire 30-year career as an assistant state's attorney Dillon claimed he never had reason to suspect that a witness had been beaten and never even heard that a suspect was left in a cold room overnight. No suspect ever told him that they had been beaten.

¶ 53    Dillon testified at the hearing in this case that he had never heard of the Goldston report and was not aware of the Egan Boyle report. Dillon testified he worked with Judge Egan's daughter in felony review but he did not recall that he ever heard that Judge Egan was assigned with investigating the crimes of Burge and his subordinates. He testified he doesn't recall that in the 1990s there were many allegations of abuse at the hands of Burge and Burge's subordinates. Dillon testified he has heard that the city of Chicago has settled cases alleging that torture and abuse occurred at the hand of Burge and Burge's subordinates. At the hearing Dillon testified that he was not familiar with nor had even heard of the city of Chicago's reparations ordinance for victims of abuse by Burge.

¶ 54    Defendant's attorney showed Dillon an exhibit and questioned Dillon about the case involving Jackie Montanez. Dillon was familiar with the case involving Jackie Montanez and was familiar with that prosecution. In 1992, at the time of that prosecution, Dillon was a trial supervisor of a team in the felony review unit. Dillon interviewed Jacqueline Montanez about two murders and recalled taking a statement from her. Dillon recalled that the trial court convicted Jacqueline but the appellate court reversed and vacated her conviction. He did not, however, recall that the appellate court found that "the girl's mother had been kept from seeing

her daughter during the interview process even though she [(the mother)] came to the police station and asked about her [(Jacqueline)]."

¶ 55    Dillon testified he had no idea Jacqueline's parents were at the police station asking about Jacqueline. He also testified that Jacqueline was definitely not "high on alcohol or drugs when he took her statement" because he "would never take a statement from someone that was under the influence." Despite the appellate court's finding as to what Jacqueline's mother observed when her mother saw Jacqueline at 8:30 in the morning to the contrary, Dillon testified he absolutely did not notice that Jacqueline was gagging and her eyes were bulging when Jacqueline was allowed to see her mother. Dillon did not know that Jacqueline's confession had 11 misspellings of her name and could not say if the appellate court would be right or wrong if it said there were.

¶ 56    Dillon testified that detectives Guevara and Halvorsen were two of the investigating detectives on the Montanez case. Dillon testified that he was sued by Jose Montanez and Armando Serrano over a case that Detective Guevara was involved in; but Dillon testified he "had nothing to do with that case." Dillon admitted his motion for summary judgment was denied in that case and the county made the decision to settle. Dillon insisted he had nothing to do with the Montanez and Serrano prosecutions.

¶ 57    Dillon testified that he did not see any pattern or practice at Area 2 or Area 3 under John Burge of torturing suspects to get them to confess.

¶ 58    Detective Micheal Duffin testified, in pertinent part, that on November 7, 1988, he was a violent crimes detective at Area 3. He and Detective Ptak, who was deceased at the time of Duffin's testimony, worked together on the murder of Theresa Quinn. Detective Duffin testified that throughout the time he and Detective Ptak were with defendant, no one hit defendant, threatened to throw defendant out of the window, or hold defendant outside a window at Area 3.

Defendant did not appear to have been beaten or have any visible scratches. Duffin testified that he was a Chicago police officer for 33 years, and no court had ever found any allegation of force against him to be sustained. He was familiar with John Burge as a commander at Area 3, but Duffin never conducted an interview or investigation where Burge was present and Burge never trained or supervised him. During his career as a detective, he never wrote out a statement for a defendant and gave it to a state's attorney as evidence in a criminal case.

¶ 59 On cross-examination Detective Duffin testified that in 1988 he was working at Area 3 under the command of John Burge. Burge had been there "maybe a year or two at the most." The chain of command went from Duffin to his sergeant to a lieutenant to Burge.

¶ 60 Detective Duffin did not recall whether he ever saw defendant handcuffed to a ring on the wall in the interview room at Area 3. Duffin did not remember if he ever saw defendant sleep or eat. Duffin testified he never struck or threatened defendant and never witnessed anyone else strike or threaten defendant. He only ever struck or witnessed another detective strike a defendant in self-defense. Duffin became aware that Burge was suspended from the Chicago Police Department for "allegations of mistreatment of prisoners." He was aware there was an investigation but did not know what was found from that investigation. He never heard of the Goldston report or a report by Justice Egan. He testified he was not aware the Office of the Special Prosecutor did an investigation of the Chicago police department as a result of the allegations against Burge but he was questioned concerning those investigations.

¶ 61 Duffin testified that he was familiar with a civil suit brought by James Kluppelberg, whose convictions were ultimately vacated. Duffin was one of the defendants named in Kluppelberg's civil suit. Duffin did not recall that Kluppelberg's pretrial motion to suppress his statements had been granted and Duffin was aware of physical evidence Kluppelberg was beaten.

Detective Duffin testified that his only involvement in the case was to drive Kluppelberg to Central Detention because he and Ptak knew Kluppelberg. Duffin was aware the city settled Kluppelberg's case. Duffin understood that Kluppelberg sued Duffin for the violation of Kluppelberg's civil rights in connection with his prosecution and conviction.

¶ 62    Duffin also knew Patrick Hampton. Duffin was shown a copy of the lawsuit filed against Duffin and others by Hampton. Duffin testified he was not aware of the amount but was aware the city paid money to settle the lawsuit Hampton filed against Duffin and others.

¶ 63    Robert Kocan testified that he has never been found guilty of physically abusing another person. He is familiar with the Office of Professional Standards and it never found an allegation against him for physical force to be sustained. He did not remember when defendant implicated him in torture. In November 1988 he believed Burge was the commander at Area 3. Kocan worked at Area 3 from 1987 until it closed. Burge was commander during some of the time Kocan was at Area 3, and Kocan was aware that Burge was suspended from the Chicago Police Department. He testified he does not have any personal knowledge of the allegations against Burge, only what he has read. Kocan was never questioned about those allegations. Kocan testified he never witnessed anyone getting beaten by a detective at Area 3.

¶ 64    Detective Lee Almanza was a homicide detective at Area 3 on November 7, 1988. He, like Kocan, testified that during his time with defendant, defendant never asserted his right to remain silent, he nor anyone else threatened or hit defendant, and he did not threaten to throw defendant out of a window. Burge was Almanza's commander but Almanza never conducted a questioning with Burge. They were not close and never worked together. Almanza worked with Burge as his commander for approximately one year. The Office of Professional Standards (OPS) has never sustained an allegation of abuse against Almanza in relation to the mistreatment

of witnesses. On cross-examination, Almanza testified that he never witnessed anything like beating suspects but he saw that in the news years later. He testified that he was not familiar with the Goldston report and he testified he has never seen a report by Justice Egan. He stated he was not aware of any admissions that the city of Chicago has made that Burge and detectives under Burge's command beat suspects.

¶ 65    Almanza testified he did participate in the investigation of Marvin Reeves and Ronald Kitchen. He testified that he was unaware that both had been convicted and later exonerated. Almanza was shown a lawsuit filed against him and others by Reeves. Almanza testified that he did recall being sued by Reeves but claimed that he was not sure why he was sued. Almanza was specifically shown Reeves' allegation in the lawsuit that officers, not including Almanza by name, tortured Kitchen to elicit evidence but Almanza testified that he did not participate or witness any other detectives torture Kitchen or Reeves. Almanza claimed that he did not know until now that the city of Chicago settled the lawsuit.

¶ 66    Detective Victor Breska testified that he was retired from the Chicago Police Department. On November 7, 1988, Breska was a detective at Area 3 in the Violent Crimes Unit. At that time he had been a detective for a little over two years. Neither Breska nor anyone else in Breska's presence threatened defendant during Breska's interactions with defendant on November 7, 1988. Breska testified he was familiar with Detective Vallandigham but they did not work the same shift in November 1988. Breska testified that he was familiar with a person named Fred Bonke and a person named John Burge. Burge was the commander of Area 3 in November 1988. Burge was never Breska's partner. Burge never trained or supervised Breska and he never attended the questioning of a suspect in Burge's presence.

¶ 67     Breska testified that no one ever threatened defendant in Breska's presence. Breska never punched defendant, hung defendant out a window, or stood in the parking lot as someone hung defendant out a window at Area 3. On cross-examination, Breska went further and stated that he has never hit a suspect and never witnessed another detective threaten a suspect with physical harm. Breska was aware of the existence and conclusion of the Golston report (that Burge systematically abused prisoners at Area 2) but was not familiar with an OPS report that was done concerning Burge. He did not remember the city of Chicago adopting a resolution that stated that Burge and officers under Burge's command "tortured scores of African-American men which resulted in false confessions leading to wrongful convictions and imprisonments." He was not aware of the Egan report concluding that "there were many cases that lead us to believe or suspect that claimants were abused under the command of Jon Burge." Breska testified he is not familiar with the Chicago reparations ordinance. Breska was shown the ordinance as one of the contested exhibits and testified that he had never seen it because he "was no longer employed in the city" in May 2015. Breska was similarly shown the case disposition of the independent third party investigation concerning defendant. Breska testified he had never seen it because Breska "was no longer employed with the police department at that time."

¶ 68     Breska testified he was familiar with Gerald Reed but did not remember questioning Reed in October 1990. When asked, Breska denied kicking a chair from underneath Reed or repeatedly kicking Reed in the area of Reed's right leg and lower back. Breska was shown a case disposition from TIRC for Gerald Reed (a contested exhibit) and testified he had never seen that document. Breska denied kicking Reed during questioning in 1990.

¶ 69     Breska testified he was not familiar with Eric Johnson. Breska was shown an exhibit that was Eric Johnson's affidavit. Johnson's affidavit averred that Breska beat Johnson. Breska

claimed he has never seen Eric Johnson's affidavit. Breska testified he was not aware that Gerald Reed was suing him.

¶ 70    Breska could recall the name James Gibson. He claims he did not know Gibson was suing him in federal court and that "nobody told me." Breska claimed he was not aware an attorney had filed an appearance on his behalf in James Gibson's civil rights suit against Breska or that Gibson alleged that Breska slapped Gibson in the face and hit him in the chest. Breska was shown another exhibit, the cover page of Gibson's complaint against Breska, and Breska claimed he was not aware of the suit or that Gibson accused Breska of beating Gibson into confessing to "the Benjamin/Walsh murders." Counsel confirmed that Breska was only being asked if he was aware of the allegation. Breska testified he was not and was not even aware of the fact Gibson had sued him.

¶ 71    Breska testified he does not know who Demond Weston is and was not aware that Demond Weston was also suing Breska. Breska testified he has never asserted his fifth amendment privilege in a case involving his work as a detective. Breska testified he never received a complaint from OPS for any mistreatment of a suspect in his custody in his entire career as a police officer and detective. Breska testified he had retired before the exhibits he was shown were created. Breska said that he had never heard of the TIRC before this hearing and no one has ever questioned him about any of the cases he was shown.

¶ 72    First, for the reasons demonstrated above, the exhibits upon which the trial court made its credibility determinations were admissible, at minimum for the limited purpose for which the trial court admitted them. No further discussion of this point is warranted. Second, the State's recitation of the evidence the State claims the trial court failed to properly recall is not accurate. The State accuses the trial court of a faulty recollection of the basis of the appellate court's

holding in another case involving the assistant state's attorney in this case. A review of the trial court's oral ruling on the motion to suppress reveals the trial court only recounted what certain testimony was in that case and not the appellate court's reasons for its judgment, as the State claims.

¶ 73    Third, the State simply marshals its selective facts in support of its view of the evidence and a different credibility determination. Similarly, the State's argument the trial court's credibility determinations as to Assistant State's Attorney Dillon and defendant are against the manifest weight of the evidence, and furthermore that defendant was "patently incredible," are arguments in favor of a different credibility determination based on the State's view of the evidence and not a demonstration that there is no evidence to support the trial court's determination or that the court's judgment is unreasonable, arbitrary, or not based on evidence. *Id.* A reasonable trier of fact could consider the witnesses' testimony that they never observed any abuse in their many years at Area 3 despite widespread and systemic abuse; never heard of or read any of the reports of abuse which implicated and called into question their career work; and/or that they did not even know that they were being sued, by whom, or why with suspicion. The exhibits on which the trial court relied lend credence to the claims that torture and abuse—of which these witnesses either should have been aware or about which they chose to "stick their heads in the sand"—did occur. Such suspicion of the witnesses' credibility in that regard could reasonably call the credibility of their testimony about what happened in this case into question.

¶ 74    The trial court stated the specific evidence it relied on in support of its credibility findings. The State does not dispute that the evidence the trial court relied on exists; the State effectively only disputes the trial court's interpretation of the evidence. The State has not demonstrated that an opposite conclusion from that of the trial court is apparent. Rather, we find

the State is effectively asking this court to substitute its judgment for that of the trial court. This we cannot do. *Id*. Therefore, we find that the State has not established that the trial court's judgment is against the manifest weight of the evidence.

¶ 75                                     CONCLUSION

¶ 76     For the foregoing reasons, the judgement of the circuit court of Cook County is affirmed.

¶ 77     Affirmed.